(Decided 29th May, 1884.)

---

THOMAS HENSON *vs.* THE STATE OF MARYLAND.

*Bawdy-House—General reputation—Evidence.*

On the trial of a party accused of keeping a bawdy-house, evidence as to the general reputation of the house is inadmissible to prove the offence.

APPEAL from the Criminal Court of Baltimore.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., STONE, MILLER, ROBINSON, IRVING, and BRYAN, J.

*L. Hochheimer*, for the appellant.

*Edgar H. Gans*, for the appellee.

MILLER, J., delivered the opinion of the Court.

The indictment against the appellant contains two counts. The first, with the usual appropriate averments in such cases, charges that on the 1st of April, 1883, and on divers other days between that day and the taking of this inquisition, he kept and maintained "*a certain common bawdy-house*," and the second charges him, in the same manner, with having kept, during the same period, "*a certain common, ill-governed and disorderly house.*"

At the trial, upon the plea of not guilty, the State, to maintain the issue on its part, proved and gave in evidence that the character of the house specified in the indictment, in the community in which it was situated, was that of a common bawdy-house or house of ill-fame, during the time mentioned in the indictment. The traverser objected to the admission of this testimony, but the Court overruled the objection and allowed the evidence to go to the jury. To this ruling the traverser, by his counsel, objected, and the jury having rendered a verdict of guilty, he has appealed.

The question is thus distinctly and sharply presented whether, under the first count in this indictment, evidence that the character of the house in the community in which it was situated was that of a common bawdy-house or house of ill-fame, is admissible as tending to prove that the traverser was guilty of the crime which that count charges him with? Counsel on both sides, have, with commendable diligence, collected in their briefs all the authorities bearing upon the subject, and they certainly present much conflict and diversity of judicial opinion and decision. They consist altogether of cases decided by the Courts in this country, and of the conclusions drawn therefrom by our own American text writers. No English decision is referred to, and we are not aware that the question has ever been decided by an English Court; and in considering the question as it arises in this State and in this case it must be remembered that the indictment is for a common law offence, there being no statute in Maryland, as there is in many of the States, upon the subject of bawdy-houses. At common law a "bawdy-house," or a "house of ill-fame," in the popular sense of the terms, is a species of disorderly house, and is indictable as a *nuisance.* 3 *Greenlf. on Ev.,* sec. 184; 2 *Wharton's Cr. Law,* sec. 2392. Hence this indictment charges that the acts and conduct specified and set out therein, are "to the great

damage and *common nuisance* of all the liege inhabitants of said State there inhabiting, residing and passing." The offence does not consist in keeping a house *reputed* to be a brothel or bawdy-house, but in keeping one that is *actually* such.

In the States which have statutes upon the subject, the decisions turn, in a great measure, upon the construction and particular language of these statutes, and, of course, to that extent, can have little or no application to the question as it is presented in this case. In others a distinction is drawn between the terms "bawdy-house" and "house of ill-fame," and they hold that where the latter terms are employed, they are to be taken in their strict etymological sense, and that they put directly in issue the fame or reputation of the house itself, and hence that it is both permissible and necessary to prove that *reputation* in the only way in which it can be proved. Others again ignore this distinction and hold the terms to be synonymous.

In speaking of all these authorities Mr. *Bishop,* after stating the proposition in which they all agree, (and to which we assent,) that it is competent in all such cases to prove by general reputation the character for lewdness of the inmates of the house and of those who frequent and visit it, though such evidence pertains in a certain sense to *hearsay,* says: "Some carry this doctrine a step further and accept the reputation of the house for bawdy, as competent evidence *prima facie* that it is a bawdy-house. Others, and probably the majority, reject the evidence, in accordance with the humane principle that a man shall not be condemned for what his neighbors say of him." 2 *Bishop's Crim. Prac., secs.* 112, 113. And, in our opinion, a majority of the best considered decisions, so hold, and upon correct principles, that such evidence is inadmissible in cases like this at common law. Thus in *Cadwell vs. The State,* 17 *Conn.,* 467, STORRS, J.,

speaking for the Court, in an extremely well reasoned opinion, after holding that, upon the proper construction of the Connecticut statute under which the prosecution was had, it was necessary for the prosecutor to prove in the *first* place the general reputation of the house, and in the *next* its actual character as a brothel, and that such *reputation* of the house could be proved like any other fact by the testimony of witnesses having knowledge of its existence, and in the same manner as the reputation of a person for truth or any other quality is proved, distinctly says: "Testimony as to the reputation of the house would clearly be inadmissible for the purpose of proving that it was in truth a brothel, and such testimony, if offered for that purpose, would be obnoxious to the objection that it is *mere hearsay.*" So in the more recent case of *State vs. Boardman,* 64 *Maine,* 523, where the statute, among other things, declared that "all places *used* as houses of ill-fame, resorted to for the purpose of lewdness or gambling are *common nuisances,*" and therefore, in this respect, merely re-enacted the common law, a party was indicted for keeping a house of ill-fame, and the question was distinctly presented whether evidence of the reputation of the house as being a bawdy house was admissible. The Court, after holding that the offence charged was that of a common nuisance, that the terms "house of ill-fame" and "bawdy-house" are synonymous, and that the gist of the offence consists in the *use* and not in the *reputation* of the house, decided that the testimony was inadmissible because it was mere hearsay evidence, and that on trial of an indictment for a *nuisance* it is not admissible to show that the general reputation of the *subject of the nusiance* was that of a *nuisance.* The judgment in that case was reversed because of the error in admitting such evidence, and all the Judges concurred in the curt remark or note of Judge PETERS that " the house must be proved to be a house of ill-fame by *facts* and not by *fame.*"

And in the still more recent case of *Toney vs. The State*, 60 *Ala.*, 97, it was held that under an indictment for keeping a bawdy-house, evidence of the general reputation of the inmates of the house, *but not of the house itself* is admissible for the prosecution. A similar ruling was also made in *State vs. Lyon*, 39 *Iowa*, 379, where the indictment was for " leasing a house for the purpose of prostitution and lewdness." In the District of Columbia, where the common law on the subject prevailed, two cases arose directly involving the admissibility of such evidence. The first was that of the *United States vs. Gray*, 2 *Cranch C. C. Rep.*, 675, (decided in 1826) where the testimony was ad-admitted (the Chief Judge CRANCH doubting), but this decision was overruled by the second and subsequent case of *United States vs. Jourdine*, 4 *Cranch C. C. Rep.*, 338, decided in 1833, in which THRUSTON, J., is reported to have changed his opinion since the case of *United States vs. Gray*, and a majority of the Court held the evidence inadmissible, thus settling the law for that Court upon this question, for the only point decided in *United States vs. Stevens*, 4 *Cranch C. C. Rep.*, 341, (which has sometimes been referred to as sustaining the admissibility of such evidence,) was that the general reputation of *persons who frequented the house* was admissible. Where the charge is simply that of keeping " a common disorderly house " the authorities, almost without exception, exclude this species of evidence, and hold that the nuisance must be shown as an existing *fact*, and not by evidence of *reputution*. *State vs. Foley*, 45 *N. H.*, 466; *People vs. Mauch*, 24 *How. Pr. Rep.*, 276; *Commonwealth vs. Stewart*, 1 *Sergt. & Rawle*, 342.

These decisions all rest, as it appears to us, upon the elementary rule of evidence which excludes hearsay testimony. The common law is studiously careful to exclude such testimony, and does not allow its introduction in order to convict parties on trial for common law offences.

We take it to be clear that a man's general bad character or reputation cannot be brought up against him when he is on trial for a specific crime, unless he first opens the way by an attempt to prove his good character. And we hold it to be equally clear that the *fact* that a crime *has been committed* cannot be proved by common rumor or general repute. The decisions which hold this evidence admissible, (where they are not founded on the language or interpretation of a statute,) seem to rest its admissibility mainly upon the ground of necessity, or rather the difficulty of obtaining direct evidence, because the operations of such houses are necessarily shrouded in secrecy. But when it is open to the prosecution to prove the general bad character for chastity of the female inmates of the house, that it is frequented by reputed strumpets, and that men are seen to visit it at all hours of the night as well as the day, we do not think there can be any very great difficulty in obtaining such direct evidence as will warrant a jury in convicting. If, however, such difficulty or necessity does, in fact exist, a remedy can be easily and speedily provided by legislation changing the rules of evidence for such cases. It is not the province of the Courts to change or relax those rules in order to *facilitate convictions* in a particular class of offences. We cannot convert the common saying "what everybody says must be true," into a legal maxim, nor can we justify the introduction of such evidence upon the ground that it will *do no harm,* because it "may very rarely occur that a place acquires the general reputation of being a bawdy-house without being one in fact." Until the Legislature intervenes and prescribes differently, the same rules of evidence must govern the trial of a party accused of this offence, which govern in all other criminal trials, and which have so governed from the time trial by jury under the common law was first instituted.

For these reasons we hold there was error in the ruling excepted to, and the appellant is therefore entitled to a new trial.

*Ruling reversed, and*
*new trial awarded.*

(Decided 29th May, 1884.)