ALLEN MYRON BUCKNER, Administrator of the
Estate of Myron Saul Buckner, Deceased, ALLEN
MYRON BUCKNER, LYDIA BUCKNER AND
JOYCE BUCKNER *v.* STATE OF
MARYLAND

[No. 207, September Term, 1970.]

*Decided January 28, 1971.*

The cause was argued before MORTON, ORTH, and POWERS, JJ.

*Bernard F. Goldberg*, with whom were *J. Patrick Coyne, Jr.,* and *Orrin J. Brown, III,* on the brief, for appellants.

*James F. Truitt, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Richard J. Kinlein, State's Attorney for Howard County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

On 13 November 1969 Myron Saul Buckner, Allen Myron Buckner, Lydia Buckner and Joyce Buckner were found guilty by a jury at a joint trial in the Circuit Court for Howard County under indictment 4564 of unlawfully keeping a house for the purpose of selling lottery tickets, proscribed by Code, Art. 27, § 360 (1st count), and unlawfully having lottery slips in their possession, proscribed by Code, Art. 27, § 362, (4th count), and under indictment 4565 of unlawfully making book on horse races (1st count), and unlawfully keeping a house for purposes of betting upon the results of races and contests (2nd count), both proscribed by Code, Art. 27, § 240. Myron Saul Buckner died on 13 April 1970 before sentences were imposed on the convictions against him. On 30 April a motion for a new trial was granted as to

Allen Myron Buckner, Lydia Buckner and Joyce Buckner on the 1st count of indictment 4565. Allen Myron Buckner, Lydia Buckner and Joyce Buckner were sentenced on 8 May 1970. As to each a fine of $250 and costs and imprisonment for one year were imposed on the conviction on each of the 1st and 4th counts of indictment 4564 and on the conviction under the 2nd count of indictment 4565. As to each the prison sentences under the 4th count of indictment 4564 and the 2nd count of indictment 4565 were to run concurrently with that imposed on the 1st count of indictment 4564. Each prison sentence was suspended and probation granted on conditions stated.

A separate appeal was noted on behalf of each of Allen Myron Buckner, Lydia Buckner and Joyce Buckner. As to Myron Saul Buckner the Clerk was requested by the Attorneys for the Administrator of the Estate of Myron Saul Buckner to enter an appeal "on behalf of Myron Saul Buckner and the Estate of Myron Saul Buckner by Allen Myron Buckner, Administrator of the Estate of Myron Saul Buckner."

I

The State moves to dismiss the appeal involving Myron Saul Buckner. It quotes Code, Art. 5, § 12:

> "A defendant in a criminal action may appeal to the Court of Special Appeals from any conviction where the sentence is other than death or from any sentence other than death imposed by a circuit court of a county or by the Criminal Court of Baltimore * * *."

It claims that the appeal as to Myron Saul Buckner is improper because no sentence was imposed on his convictions.

Art. 5, § 12 is the codification of § 1, ch. 12, Acts 1966, effective contemporaneously with the adoption of amendments to the Constitution proposed to permit the creation of this Court. The amendments were ratified 8 November 1966.[1] The Act further provides:

---

1. See Md. Const., article IV, §§ 14A, 14B, 15, 16, 18 and 18A.

"A defendant in a criminal action may appeal to the Court of Appeals from any conviction where the sentence is death or from any death sentence imposed by a circuit court of a county or the Criminal Court of Baltimore * * *."

"Conviction" and "sentence" are legally distinct. Conviction is the determination of guilt; sentence is the judgment entered thereon. *Sands v. State,* 9 Md. App. 71, 79. The question is whether an appeal lies from either a conviction or a sentence.

Prior to the amendment of Code, Art. 5, § 12 by Acts 1966, ch. 12, § 1, a defendant in a criminal action was empowered to appeal to the Court of Appeals "from any conviction or sentence" imposed by a circuit court of a county or by the Criminal Court of Baltimore.[2] It is clear that the 1966 Act made no change in the right of appeal from any conviction or sentence but merely delineated the right in terms of the jurisdiction of this Court and the Court of Appeals. The right of appeal so conferred must be construed, the Court of Appeals held in *Pearlman v. State,* 226 Md. 67, in the light of Code, Art. 5, § 13, which provides:

"In all criminal actions where sentence has been suspended by the court the defendant shall have a right to appeal under § 12 or § 12A of this article in the same manner as if sentence or judgment had been entered in said action." [3]

So in *Pearlman,* observing that it is settled that an appeal in a criminal case is premature until after final judgment,[4] see *Greathouse v. State,* 5 Md. App. 675, the Court

2. See Acts 1957, ch. 399, § 4, and Acts 1961, ch. 616, § 2.

3. Section 12A deals with right of appeal in cases from the Municipal Court of Baltimore City. Section 13, a codification of ch. 12, § 1, Acts 1966, provides in substance what was enacted by Acts 1957, ch. 399, § 4 and Acts 1961, ch. 616, § 4.

4. "A criminal case is not complete and the case is not disposed of until sentence has been pronounced." 5 *Wharton's Criminal Law and Procedure* (1957) § 2176, p. 370.

"There has been applied through the years a corollary to the rule that there can be no appeal except from a final judgment. Ac-

rejected the argument that when ch. 399, Acts 1957 gave a right to appeal "from any conviction or sentence", it changed the former law as established by Acts 1892, ch. 506, expressly giving the right of appeal from a final judgment. It was claimed that the 1957 Act made the law as it was before the passage of the 1892 Act, when appeals in criminal cases were entered before the interposition of sentence. The Court said, at 71:

> "We think Sections 12 and 13 must be read together to mean that in a criminal case there is an appeal from any judgment and *from any conviction where sentence has been suspended.*" (emphasis supplied)

And § 13 refers to the suspension of the imposition of sentence, not to the suspension of its execution. *Brown v. State,* 237 Md. 492, note 7, at 506. See *Knight v. State,* 7 Md. App. 313, 324.

As to Myron Saul Buckner in the instant case there was no judgment nor was there a *suspension* of the imposition of sentence. It was simply that the defendant died before he was sentenced and upon his death no sentence could be imposed. There is no constitutional right to appeal, under the due process clause or otherwise, *Brown v. State, supra,* at 499. The right is given by statute in this jurisdiction and in the circumstances existent the statute does not entitle Myron Saul Buckner to appeal. His appeal is dismissed.

## II

The crux of this case is the validity of the search and

---

tion of a trial court which denies an absolute constitutional right, although seemingly interlocutory, will be reviewed by this Court without requiring the complainant to proceed to final judgment and then seek review of the challenged action on appeal from that judgment. The corollary is subject to the qualification that even though a constitutional right is involved, action of the lower court rightfully exercising discretion as to the functioning of the right will not be so reviewed." *Pearlman v. State, supra,* at 71. See *Raimondi v. State,* 8 Md. App. 468; *Brown v. State,* 2 Md. App. 388; *Allen v. State,* 1 Md. App. 249.

seizure warrant under the authority of which evidence was seized by the police.

A judge may issue a search warrant when it is made to appear to him by a written application signed and sworn to by the applicant, accompanied by an affidavit containing facts within the personal knowledge of the affiant, that there is probable cause to believe that a crime is being committed by any individual or in a building within his territorial jurisdiction, and that evidence of the crime is upon the person or within the place to be searched. Code, Art. 27, § 551; *Salmon v. State,* 2 Md. App. 513, 519. Probable cause is less than certainty or demonstration but more than suspicion or possibility. It is to be determined by the judge to whom application for the warrant is made. If a prudent and cautious man would be justified from the facts presented in the affidavit in believing that the offense has been or is being committed, the warrant properly may be issued. In determining the existence *vel non* of probable cause, the judge may give consideration to the special significance which objects, happenings, and individuals may have conveyed to a trained, experienced and knowledgeable police officer making the affidavit accompanying the warrant. *Henson v. State,* 236 Md. 518, 521. And the affidavit may be based on hearsay information, even from an unidentified informant, and need not reflect the direct personal observations of the affiant, but it must contain some of the underlying circumstances from which the affiant could be reasonably justified in a belief that the hearsay information was reliable or the informant was credible. *Grimm v. State,* 6 Md. App. 321; *Colopietro v. State,* 5 Md. App. 312; *Kist v. State,* 4 Md. App. 282. See *Nutter v. State,* 8 Md. App. 635, 641; *Mullaney v. State,* 5 Md. App. 248, note 4 at 254.

When a search warrant is challenged, the lower court, and the appellate court when the determination of the lower court is before it on appeal, must look for probable cause only in the affidavit itself and may not go outside it. *Scarborough v. State,* 3 Md. App. 208. However

the affidavit should be interpreted in a common-sense and not in a hypertechnical manner, and the resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants. *Frey v. State,* 3 Md. App. 38, 45-46, summarizing the observations in *United States v. Ventresca,* 380 U. S. 102. But, as we noted in *Frey,* this is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists. See *Hall v. State,* 5 Md. App. 394. In short, there are established propositions lately specifically affirmed in *Spinelli v. United States,* 393 U. S. 410, 419 and noted by us in *Price v. State,* 7 Md. App. 131, 137:

1) the standard of probable cause is only the probability and not a *prima facie* showing, of criminal activity;
2) affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial;
3) issuing judges are not to be confined to niggardly limitations or by restrictions on the use of their common sense in judging probable cause;
4) the determination of probable cause by the issuing judge should be paid great deference by reviewing courts.

The search and seizure warrant, issued by a judge of the Circuit Court for Howard County, commanded any officer of the Maryland State Police, with the necessary and proper assistants, to search Myron S. Buckner, Joel Tidman, Vivian Helen Larkin and Allen Buckner, three described automobiles owned respectively by Myron S. Buckner, Joel and Patricia Carolyn Tidman and Allen Buckner, and the premises 448 Columbia Road, Howard County, Maryland for records and paraphernalia related to gambling and if such property be found to seize it. The officer was further commanded upon execution of the

warrant to arrest any persons found "then and there engaged in the commission of a crime."

The warrant, issued on an affidavit by Lieutenant Thomas J. Coppinger of the Baltimore City Police Department, consisted of 36 legal size pages of double spaced typewriting. The question is whether this application, tested by the rules above discussed, showed probable cause for the issuance of the warrant.

The first page of the affidavit established Coppinger as a police officer experienced in the investigation of violation of the gambling laws. The second page set out the usual method of operation of those engaged in unlawful lottery operations, tracing the procedure from the placing of a numbers bet with a writer, to the turn-in of the slips at an "office", to the pay-off of winners. Coppinger concluded:

> "There are certain 'hallmarks' that have become characteristic of the methods of transporting and conveying lottery wagering paraphernalia and money such as small brown paper bags and various size envelopes. Because possession of any lottery paraphernalia is a crime in Maryland, it is usual for anyone engaged in the numbers or lottery operation to act in a covert and clandestine manner in order to secrete the records and funds of the operation and to avoid detection and seizure."

Pages 3 through 10 of the affidavit set out information received from an unnamed informant during an interview on 10 and 11 February 1969 in the State's Attorney's Office of Baltimore City, the Emerson Hotel and a Baltimore City Police Department unmarked automobile. Coppinger was not one of the interviewers; he learned what the informant had said "by means of listening to tape recordings of the interview and discussion with the Assistant State's Attorneys involved in the actual interrogation of the confidential informant," known to Coppinger since 10 May 1968 "as being involved in lottery opera-

tions in the City of Baltimore and Baltimore County."
The informant said he had been a high-level writer in a
lottery and book making operation which received bets of
about $100,000 to $150,000 a week. The top men in the
organization were "Mickey" and "Gene", owners of the
Village Bar in Baltimore City, and Warren Toelle, owner
of an Atlantic Service Station at Caton and Monastery
Avenues in Baltimore City. The informant received bets,
lottery and horse-race, from 50 to 60 writers who identi-
fied themselves by code, over two unlisted, private tele-
phones provided him in his place of operation. He was
instructed by Mickey to "lay off" any bet over $5 and by
Toelle to "lay off" any bet over $3, with the organization's
"lay-off man", who would call every day at 2:00 P.M.
He would lay-off between $1000 and $1500. As soon as
the lay-off man called, the informant would total the day's
bets and prepare them either for delivery to the pick-up
man or drop-off to one of the backers. This would have
to be accomplished by 2:30 P.M. He would turn the bets
over to the pick-up man, or send them by his runner to
the bosses or personally take them to a pre-arranged loca-
tion, usually a shopping center parking lot, where he met
Mickey or Toelle and passed the bets through their auto-
mobile window. He telephoned Mickey every evening at
his home, telephone number 465-1653. He had never been
to Mickey's house but knew it was in the county on Route
40 West past a shopping center. Mickey drove an Olds-
mobile which the informant thought was a 1966 model.
Mickey was at his residence between 3 P.M. and 6 P.M.
where he took bets over the telephone. Earlier in the day
he was "downtown." A woman named Vivian worked for
Mickey as a high-level writer in the organization.

A man named Tony was a writer for the organiza-
tion and turned in his bets to Mickey, Gene, and Toelle.
Tony lived at 543 Yale Avenue and received his bets there.
He drove a blue Chevrolet convertible with a white top,
license FH 6132.

The informant was trained by "Jules", a young man
about 25 years old of tall, thin build. When informant

was arrested during a raid in May of 1968 and terminated his activities as a writer, the bets formerly taken by him were taken by Jules. Jules' telephone number was 247-1474 and all the "big stuff" came through that number.

The informant said that Toelle also owned M & F Motors, Inc., a used car lot, with Edward "Moe" Morehead. The lot was located at 2040 Frederick Avenue and Moe wrote a small amount of numbers there.

Toelle employed a "colored woman" named Ann who took bets for him at a location never disclosed to the informant. She would call informant and ask if he wanted to lay-off any bets.

The informant gave the usual "daily activity pattern" of Toelle. He left his home on Frederick Avenue about 11:00 A.M. and went to the Atlantic Station at Caton and Monastery Avenues. He took bets over the pay phone in the station and when the local race tracks were open, left for the track. He spent the afternoon at the track and then went to Ann's apartment about 7:00 P.M., where he remained for several hours and at times all night. Toelle took the betting records to his home at 6621 Frederick Avenue and worked on them at his dining room table.

The informant said he received a salary and commission totaling between $400 to $700 a week and in addition all rent, furniture, utilities and living expenses were paid by the organization. He was told by Toelle when he first went to work that "he would be protected by the organization as far as fines and counsel fees were concerned should he ever be arrested * * *. In addition Warren Toelle informed [him] that he would be tipped off in advance of any raid by the Baltimore City Police Department at which time he was to 'lock up shop, destroy the stuff, and get out.' "

In *Aguilar v. Texas*, 378 U. S. 108 the Supreme Court recognized that the constitutional requirement of probable cause can be established by hearsay information [5]

---

5. We think it immaterial in the circumstances that Coppinger did not obtain his information personally from the informant. We

but the application must set forth some of the underlying circumstances necessary to enable the judge independently to determine the validity of the informant's conclusion that the crime was being committed as alleged and the affiant must support his claim that the informant was "credible" or his information "reliable." Explicating *Aguilar's* principles in *Spinelli v. United States,* 393 U. S. 410, the Court said that the informer's report must first be measured against *Aguilar's* standards so that its probative value can be assessed. If the tip is found inadequate under *Aguilar* the other allegations which corroborate the information contained in the hearsay report should then be considered. The judge must ask: "Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration?"

Coppinger does not expressly claim in his affidavit that the informant was credible or his information reliable. But the affidavit contains reasons why the informant was credible and his information reliable. Coppinger ascertained:

(1) that the informant "was arrested in a raid in Baltimore City in the summer of 1968 which resulted in the recovery of a large amount of lottery paraphernalia indicating approximately $40,000 in play";

(2) that since 22 May 1964 the licensees of the Village Bar have been Eugene Adler, Harry A. Buckner and George H. Finecey;

(3) that the lessee of the Atlantic Station at Caton and Monastery Avenues from October 1966 to September 1968 was M & F Motors, Inc., the president of which was Toelle and the secretary of which was Vivian Larkin;

---

know of no rule which precludes the information as received by Coppinger from being used to establish probable cause. See *Rugendorf v. United States,* 376 U. S. 528; *McCray v. State of Illinois,* 386 U. S. 300; *Bolesta v. State,* 9 Md. App. 408.

(4) that the telephone number 465-1653 was listed to Mrs. Lydia B. Buckner of 448 Columbia Road, Howard County, Maryland, which is adjacent to Route 29 about two miles from Route 40;

(5) that in the driveway of 448 Columbia Road was a 1967 Oldsmobile listed to Myron S. Buckner, 448 Columbia Road, Howard County, Maryland;

(6) that the automobile driven by the writer named "Tony" whose residence was pointed out by the informant to be 543 Yale Avenue was listed to Anthony Gerard Constantino, 543 Yale Avenue, Baltimore, Maryland;

(7) that the telephone number of the writer "Jules" was listed to Joel Tidman, 4341 Alan Drive, and was disconnected on 23 January 1969;

(8) that 2040 Frederick Avenue was occupied by M & F Motors, Inc., a used car dealership;

(9) that there was a telephone listing in the name of Alfred W. Toelle at 6621 Frederick Avenue.

From Coppinger's training experience and knowledge he was familiar with:

(1) the practice of laying-off bets as described by the informant "so that the organization is never required to pay out too much by way of pay-off to the bettors if a 'hit' is made";

(2) the practice of those engaged in lottery operations of picking up the day's wagers from all of the numbers writers in the organization by a time in the day near 2 P.M. for delivery to the "backers" or "bosses" so as to preclude the submission of a wager after the winning number for the day has been calculated;

(3) the course of conduct described by the informant as being the usual means whereby lot-

tery and horse-bet wagers are transported from the high-level writers to the backers;
(4) the standard practice in the conduct of bookmaking and lottery operations of the backers taking steps both to protect and immunize their employees from prosecution as set out by informant.

We believe that the affidavit was sufficient to establish the informant's credibility and the reliability of his information.

It is patent that the information given by the informant contained a sufficient statement of the underlying circumstances from which the informant concluded that Mickey and Toelle were running a bookmaking operation and that Jules, Ann, Vivian and Tony were actively engaged in the unlawful enterprise. The informant worked for and with them. He obtained his information by working for the organization of which they were a part and he described the criminal activity in sufficient detail so that the issuing judge could know that he was relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation. In *Spinelli* the Court said that the detail provided by the informant in *Draper v. United States*, 358 U. S. 307, provides a suitable benchmark. At 416. This being so, the detail provided by the informant here is certainly sufficient. See *Price v. State, supra*, at 139.

The informant did not expressly identify Myron Saul Buckner as Mickey nor did he expressly assert that violations of the gambling laws were being committed in the premises 448 Columbia Road. But we think that Coppinger had probable cause, within the definition of that term and upon application of the rules to be followed in ascertaining its existence, to believe that Mickey was Myron Saul Buckner and that 448 Columbia Road had been used to carry on the unlawful operation. We reach this conclusion in the light of the telephone number habitually

called by the informant, the general location of Mickey's residence as known by informant, and the similarity of the automobile informant knew to be driven by Mickey and the automobile seen by Coppinger parked at 448 Columbia Road and listed in Myron S. Buckner's name. And we think Coppinger had probable cause to believe that "Jules" was Joel Tidman, the telephone over which Jules took bets being listed to Joel Tidman. And, of course, Warren was identified by the informant as Warren Toelle.

The warrant was issued on 14 April 1969 and the informant's disclosures covered a period ending a year before. While the information from the informant justified probable cause to believe as of May 1968 that gambling records and paraphernalia were concealed in the premises 448 Columbia Road and on the person of each of Myron Saul Buckner, Joel Tidman, Vivian Helen Larkin and Warren Toelle, there was nothing in what the informant said, standing alone, to give probable cause to believe that such contraband was so concealed in April 1969. However, as set out in the affidavit, Lieutenant Coppinger and Detectives Charles Rothrock and Richard Nevin conducted an investigation and surveillance during the period 14 February 1969 through 2 April 1969 which included the persons and places referred to by the informant. During that period there was, at various times, surveillance of the Atlantic Gas Station at Caton and Monastery Avenues, 6621 Frederick Avenue, 448 Columbia Road, 2314 Edmondson Avenue, 2502 Edgecomb Circle North, 720 S. Woodington Avenue, 5602 Pembroke Avenue, 5623 Johnny Cake Road, and the Village Bar at 615 E. Baltimore Street (which had not then reopened for business after changing its location from Baltimore and Harrison Streets). Persons observed who were identified were Myron Buckner, Warren Toelle, Tayfoid Hargrove, Allen Buckner, Carolyn Jones, Joel Tidman and Vivian Larkin. The observations of the police showed an interrelationship between these places and persons. The Atlantic Gas Station was owned by a corporation of which Warren Toelle was president and Toelle lived at 6621

Frederick Avenue. Myron Buckner and Allen Buckner lived at 448 Columbia Road. Tayfoid Hargrove lived at 2314 Edmondson Avenue. Carolyn Jones lived at 2502 Edgecomb Circle North, Apartment T1 in the basement. Joel Tidman lived at 720 S. Woodington Avenue. Vivian Larkin lived at 5623 Johnny Cake Road. As the surveillance progressed it became readily evident that the daily activities of the principals were similar to those as described by the informant. Toelle would leave his home at 6621 Frederick Avenue, drive to the Atlantic Gas Station and stay only a short time. In the afternoon he would go to the Pimlico Race Track, from there to the Pimlico Hotel and from there to the basement apartment, T1 at 2502 Edgecomb Circle North where at times he spent the night. A nonpublished phone at the Edgecomb Circle address was in the name of Carolyn Jones. He was seen there on 26 March, 29 March, 10 April, and 11 April. On 29 March a surveillance van and a private automobile were used to watch 2502 Edgecomb Circle North. The affidavit reads:

> "Parked directly outside of 2502 Edgecomb Circle was a light blue and black Mustang bearing Maryland registration CY 9807 (old issue). Your Affiant has checked the records of the Department of Motor Vehicles and learned that the aforesaid vehicle is listed to Carolyn Virginia Williams, 101 Edgewood Street. It is noted by your Affiant that premises 101 Edgewood Street is approximately one block from the Atlantic gas station at Caton and Monastery Avenues. At 12:32 p.m., an unidentified colored male approximately 25 years old entered the apartment at 2502 Edgecomb Circle and walked down to the basement towards the left. Your Affiant has ascertained that the apartment toward the left is apartment T1 listed to Carolyn Jones as set forth previously. At approximately 1 p.m., the blue and black Oldsmobile C987 owned by

Warren Toelle parked in front of 2502 Edge-comb Circle. The car was driven by a colored female who became obviously interested and anxious at the sight of the surveillance van parked across the street. The aforesaid colored female alighted from the vehicle glancing at the surveillance van. The aforesaid colored female reached back into Toelle's car and removed her coat and three brown paper bags. Two of the bags were small and light in weight and carried together in one hand. The third brown paper bag was approximately 12″ long, 8″ wide and 6″ deep and appeared light in weight. This bag was carried in the colored female's other hand by the top with no apparent effort. Your Affiant is familiar with the customary use of such brown paper bags by backers, runners, pick-up men, and writers engaged in a lottery operation as the means whereby lottery paraphernalia and currency are transported from location to location. The colored female carried the bags into 2502 Edgecomb Circle North and once inside the door, turned around to watch the surveillance van again. She walked down the steps to the basement apartment and looked up once more at the van. She then entered the apartment on the left, ascertained by your Affiant to be Apartment T1. The aforesaid colored female who entered 2502 Edgecomb Circle, Apartment T1 with the brown paper bags is in her late 30's or early 40's, heavy set and wearing what appeared to the Affiant to be a wig of frosted hair. At 1:07 p.m., a colored female in her early 20's and thin came out of the basement apartment on the left at 2502 Edgecomb Circle and entered a blue and black Ford automobile which had been parked in front of 2502 Edgecomb Circle. At 2:08 p.m., your Affiant observed that someone from the basement apartment on the

72

left at 2502 Edgecomb Circle was looking through the venetian blinds at the surveillance van. At 2:10 p.m., an unidentified colored male arrived at 2502 Edgecomb Circle and entered the basement apartment on the left. This colored male left the apartment at 2:43 p.m., and drove away from the area. At 2:37 p.m., Warren Toelle came out of the basement apartment on the left ascertained by your Affiant to be Apartment T1, and entered C987 which had been parked in front of 2502 Edgecomb Circle by the aforesaid colored female. As Toelle entered his automobile he looked at the surveillance van several times. Toelle left the area in C987 at 2:55 p.m. Your Affiant once more observed that someone was looking out through the venetian blinds of the basement apartment to the left at 2502 Edgecomb Circle. At 4:48 p.m., your Affiant once again observed that someone was observing the surveillance van through the venetian blinds. At 5:30 p.m., an unidentified colored male approximately 5'10", 150 lbs. entered apartment T1 at 2502 Edgecomb Circle. This unidentified colored male was carrying in one hand a light paper shopping bag. The aforesaid colored male left the premises at 2502 Edgecomb Circle at 6:01 p.m., along with an unidentified colored female who had not been previously observed by your Affiant on this day. At 5:55 p.m., an unidentified colored male approximately 5'10", 150 lbs. entered 2502 Edgecomb Circle and went down to the basement apartment and towards the left. At 6:40 p.m., the unidentified female previously described, who had earlier on that day been driving Toelle's car, came out of the apartment T1 at 2502 Edgecomb Circle and then drove the blue and black Mustang CY9807 previously described and registered to Carolyn Virginia Williams, 101 Edge-

wood Street. This colored female left the area driving CY9807. At 6:45 p.m., a yellow cab stopped in front of 2502 Edgecomb Circle and the unidentified colored male and female who had previously left apartment T1 at 6:01 p.m., re-entered apartment T1. The cab waited for an hour, until 6:48 p.m., when the two aforementioned individuals came out of apartment T1 at 2502 Edgecomb Circle at which time the colored male was carrying a large brown paper bag similar to that that he had carried into the premises at 5:30 p.m. At this time the man and the woman entered the yellow cab which had been waiting. At 7:55 p.m., the aforesaid described unidentified colored male who had previously carried a brown paper bag into and out of apartment T1 returned to apartment T1 in a Diamond Cab and left in the Diamond Cab at 8:10 p.m. It was noted by your Affiant that on several occasions during the period of surveillance on this date a 1959 or 1960 Chrysler Imperial bearing Rhode Island license plates EP210 slowly cruised by in front of 2502 Edgecomb Circle. This vehicle did not stop. At approximately 6:30 p.m., an unidentified colored male parked in an automobile behind the surveillance van. This unidentified colored male sat in the automobile for approximately one hour smoking cigarettes and watching the surveillance van."

On 1 April Toelle went to the Atlantic Station and into the office. "Almost simultaneously" the same Chrysler automobile which had driven past 2502 Edgecomb Circle North several times on 29 March pulled in the station. A colored male got out and went into the office. About a half hour later both the man and Toelle came out and each drove away. The Chrysler was later seen on Pennsylvania Avenue near Wilson Street. The affidavit reads:

"Your affiant from previous experience knows that the area of Pennsylvania Avenue and Wilson Street is reputed to be an area of very heavy lottery activity." Coppinger determined that the license tags on the Chrysler (Rhode Island EP210) were listed to a black 1963 Chevrolet Impala. He stated in the affidavit: "Your affiant is familiar with the strategem of switching license plates between various motor vehicles as a common device employed by lottery writers, pick-up men, and backers as a means to avoid identification and detection."

On 10 April a colored male walked out of 2502 Edgecomb Circle North about 10 minutes after Toelle entered about 6:45 P.M. The colored male had in his hand a brown paper bag "appearing full and light in weight." He was the same person seen on 29 March carrying a brown paper bag into and out of the basement apartment T1. Almost immediately thereafter another colored male went into the basement at 2502 Edgecomb Circle North with a brown paper bag in his hand.

While watching Toelle's home at 6621 Frederick Avenue on 26 March the police saw a colored male later identified as Tayfoid Hargrove of 2314 Edmondson Avenue enter the premises about 9:00 A.M., he remained about 10 minutes and left. The police determined that 2314 Edmondson Avenue had two non-listed telephones located in the basement and upstairs. On 1 April a colored male left 2314 Edmondson Avenue about 8:45 A.M. and drove in an automobile listed to Tayfoid and Otelia Hargrove to the vicinity of Toelle's home. Surveillance was broken "by means of deceptive and evasive driving patterns." On 11 April the same man left 2314 Edmondson Avenue about 10:00 A.M. in the Hargrove's automobile and returned at 10:33 A.M. He entered the premises carrying a brown paper bag which appeared light in weight. On 12 April two colored males left 2314 Edmondson Avenue at 8:00 A.M. and started to open the trunk of the Hargrove's car but then walked away. They returned twenty minutes later. One was carrying a brown paper bag between two larger white plastic bags and the other had a

small parcel wrapped in white paper or cloth. About 8:30 A.M. the man who had driven the Hargrove's car on 11 April came out of the premises, removed a small parcel in a brown paper bag and put it in the trunk. He drove away. He returned at 9:40 A.M. There was "a large bulge in his right front pocket." He entered the premises. He left about 5 minutes later; "there was no longer a bulge as described in the right pocket."

On 1 April Joel Tidman entered the picture. The police followed Myron Buckner from his residence to the E. J. Korvette parking lot off of Route 40. Buckner pulled beside a white Ford later ascertained to be registered to Patricia Carolyn Tidman, 720 S. Woodington Avenue. A young white male in his early twenties, tall and thin, known by sight to the police as Joel Tidman alighted from the Ford and talked to Buckner still seated in his car. The police were unable to see whether "anything physically transferred between the cars." After a few minutes Tidman got back in his car and both he and Buckner drove away. On 5 April the police placed 720 S. Woodington Avenue under surveillance. About 6:45 P.M. Tidman came out of the house and drove the Ford to 448 Columbia Road. He went inside and stayed only a few minutes. Buckner's car was parked in the driveway. On 7 April the police followed Tidman from his residence to a parking lot in the rear of the Pancake House at Johnny Cake Road on Route 40 in close proximity to the E. J. Korvette parking lot. He was joined by Vivian Larkin and within a few seconds Buckner drove in. Buckner walked over to Tidman and Larkin. The two men conversed for 2 or 3 minutes, shook hands and each of the three drove away in their respective automobiles. The officer was unable to ascertain whether or not anything had been transferred between the two men. On 8 April Tidman left his house about 6:55 P.M., drove to the Korvette parking lot on Route 40. At 7:10 P.M. Buckner pulled alongside Tidman's car, Tidman got out and walked over to Buckner's car. With the aid of binoculars the po-

lice saw Tidman give Buckner some papers. Both drove away.

On 3 April after Buckner and Tidman met on the parking lot, Buckner drove to the Village Bar, arriving about 7:30 P.M. Twelve minutes later he left and drove "by means of an extremely deceptive and evasive pattern to 5206 Pembroke Avenue, arriving at 8:02 P.M. He entered the premises. Six minutes later a young white man between 17 and 19 years of age came out and removed a white box approximately 12 inches high, 18 inches long and 18 inches wide, which appeared light in weight, from the rear seat of Buckner's car and took it into the house. About 20 minutes later Buckner, the young man and two women left the house and went to a nearby tavern where they remained until 11:05 P.M. While Buckner was gone the dining room of 5206 Pembroke Avenue was "completely closed off by drawn shades", although well lighted and the police could see that people were moving about. When Buckner left the tavern he entered 5206 Pembroke Avenue and remained about an hour. He then drove to the Village Bar at 615 E. Baltimore Street and entered by means of a key. The Village Bar had moved from Baltimore and Harrison Streets and was not as yet open for business. About 1:30 A.M. a white male came out of the Bar carrying a small brown parcel appearing light in weight and placed it in a black Oldsmobile. Shortly thereafter Buckner left and drove home. On 5 April Buckner's car was seen parked in front of 5206 Pembroke Avenue at 1:05 P.M. and at 2:24 P.M. Buckner came out of the premises and drove away. On 8 April after Buckner met Tidman on the parking lot he drove to the Village Bar, entered, remained only 3 minutes and then drove to 5206 Pembroke Avenue. From his car he took a box which appeared light in weight and a parcel and went into the house. He left about 20 minutes later and broke surveillance by means of an evasive and deceptive driving pattern.

Surveillance of 448 Columbia Road was conducted on 11, 13, 27, 28 and 31 March and 1, 2, 3, and 7 April.

Buckner usually left home between 10:00 and 11:00 A.M. On 27 March, before he left, a woman entered and left in 5 minutes and two men entered and stayed 4 minutes. On 2 April, before he left, a woman entered and remained about 50 minutes and two men who drove up in a cream-colored Chrysler, entered, one of whom was carrying a small paper bag appearing light in weight. They stayed 2 minutes. Another woman entered and left in 5 minutes. About 5:10 P.M. after Buckner had returned home a woman carrying a small white bag went in the house and left 5 minutes later. Then the Chrysler which had been there in the morning drove up and the same two men went in the house. They left about a half hour later carrying what appeared to be an adding machine. On three of the days Buckner was under surveillance he went to Blumson's Drug Store at Front and Baltimore Streets, staying 5 minutes, 2 minutes and 1 minute respectively. On 5 of the days he went to the Village Bar. He entered the Bar on the dates and at the times set forth below and remained on the premises for the time indicated.

28 March—11:20 A.M.— 30 minutes
2 April—11:30 A.M.—4 hours
3 April— 7:30 P.M.— 12 minutes
4 April—12:50 A.M.—1½ hours
8 April— 7:34 P.M.— 3 minutes

On 28 March Buckner left the Bar accompanied by two men. They drove "in a circuitous, deceptive and evasive manner" to the corner of Webster Street and Fort Avenue. The driver walked around the corner, returned carrying a small parcel in his hand and reentered the vehicle. The circuitous driving resumed. In the vicinity of Baltimore Street and Central Avenue, the car "quickly pulled into an open parking space out of a fast moving lane of traffic." The officer conducting the surveillance had to drive past the car and then lost sight of it. On 5 April after Tidman had gone to Buckner's home, Buckner was observed by the police with the aid of binoculars "sitting in what appeared to be the dining room speaking into

a telephone while looking at some papers he held in his hand. The papers appeared to be 8½ x 11″ sheets of loose leaf paper and Buckner appeared to be reading from the sheets into the telephone." Coppinger stated in the affidavit: "Your affiant on the basis of previous experience in lottery investigation and this investigation and his participation in the preparation of lottery prosecutions is aware that backers or principals of lottery operations normally receive on a daily basis tally sheets, run-down sheets and hit sheets which are commonly prepared on 8½ x 11″ sheets of white loose leaf paper."

The police observed during the surveillance of Buckner and Toelle that each of them habitually drove from place to place by means of an evasive and deceptive driving pattern, as for example, driving at approximately 25 m.p.h. on a high speed limited express highway, thus making it impossible for surveillance to be maintained from the rear; speeding through yellow and red traffic lights to separate themselves from the traffic behind; traveling along in a fast moving left lane and suddenly stopping, causing traffic to back up and pull around, and then making a U-turn and driving off in the opposite direction: and driving to the place of destination by a circuitous route.

We think that the affidavit contained a substantial basis for the issuing judge to conclude that probably gambling records and paraphernalia were in the premises 448 Columbia Road and in the automobiles and, except for Allen Buckner, on the persons designated in the warrant. We reach this determination by considering the observations of the police in the light of the disclosures of an informant shown to be reliable. Even if neither the observations nor the disclosures standing alone were enough, together they gave probable cause for the trained, experienced and knowledgeable affiant to believe that Myron Saul Buckner and Warren Toelle had been and were still engaged in unlawful gambling activities, that Myron Saul Buckner was "Mickey", that Joel Tidman was "Jules", that Carolyn Jones was "Ann", that Vivian Lark-

in was "Vivian", that Tidman took over the work formerly performed by the informant and that Jones and Larkin were active participants in the illegal operation. We can reach no other result when the affidavit is considered in a common sense rather than a hypertechnical manner, granting as we must, deference to the issuing judge's determination of probable cause. And we observe that if the affidavit here is deemed doubtful or marginal, it is to be resolved by the preference accorded warrants.

Except as to the command to search Allen Buckner we find that the search and seizure warrant was valid. We hold that the trial court did not err in denying motion made to quash it.

The warrant was not valid as to its command to search Allen Buckner because the affidavit did not give probable cause to believe he was engaged in violation of the gambling laws. The informant did not mention him and although he was observed on the premises 448 Columbia Road during the police surveillance, he lived there. His actions observed by the police did not meet the test of probable cause to believe he was participating in the illegal operation. While Myron Saul Buckner drove Allen Buckner's automobile on several occasions, he was not accompanied by Allen Buckner.[6]

### III

The warrant was executed on 14 April 1969 about 8:00 P.M. at 448 Columbia Road by Detective Sergeant Gary R. Grant of the Maryland State Police. He was assisted by Sergeant Jack Burke of the Howard County police, Sergeant George Snyder of the Maryland State Police and Robert Stewart, an Assistant State's Attorney for Baltimore City, from whom he obtained the warrant.[7] The

---

6. The trial court granted a motion to suppress the introduction of $89 obtained by a search of the person of Allen Buckner when the warrant was executed.

7. The return of the warrant indicated the following was seized:
"1. Approximately $95,890.00 various denominations of U.S. currency.
2. Approximately 76 unconventional lottery slips on which

premises consisted of a living room, dining room, kitchen and bedroom on the first floor and two bedrooms and bath on the second floor. After conducting a search on the first floor Grant, accompanied by Stewart, went to the second floor. Grant searched a bedroom occupied by Allen Buckner who was in the room. In a desk drawer Grant found a can containing memorandum pads and behind the pads was $650. There was also $33 in cash in the drawer. At this point defense counsel, anticipating testimony to come, objected to the admission of anything found by Stewart. Evidence on the issue was taken out of the presence of the jury. Grant said that Stewart called his attention to and picked up a small metal box in a closet. Stewart placed it on the bed. Grant asked Allen Buckner if he had a key to it. Grant did not remember whether the box was locked or unlocked but he opened the box and examined the contents. On cross-examination Grant said he did not remember whether Buckner had a key or whether the box was unlocked or who actually released the locking mechanism, but it was done in any event at his direction. Nor did he recall whether the closet door was open or closed. Allen Buckner said the box was in the far end of a seven foot long closet with louver doors that were closed. Stewart opened the doors, took out the

appears approximately 48,117 lottery wagers representing approximately $33,452.00 action.

3. Approximately 84 slips of paper on which appears many inked notations, names, figures and approximately 313 wagers on horse races representing approximately $1,792.00 action.

4. Several 'rundown sheets' and 'tally sheets' on which appears many inked notations, code letters, figures and records of monies owed to and by various lottery and horse race bettors and writers.

5. One copy of the National Armstrong Daily News Review dated 4-14-69 on which appears inked notations of results of horse races.

6. A large quantity of unused 'rundown sheets'; many pads of papers, pens, pencils, miscellaneous slips of paper on which appear names, figures and other notations.

7. One small piece of flash paper.

8. Miscellaneous receipts of bills, bank records, etc.

9. Three telephone instruments with number 465-1931; one telephone instrument 465-1653."

box, put it on the bed and asked if it was locked. Buckner said there was a key someplace but he did not have it. Stewart opened the box. It was not locked—he just released the catch and opened it. When the box was placed on the bed Grant stopped searching the desk and came over and stood by the bed.

Code, Art. 27, § 551 provides *inter alia* that a judge may issue a search warrant "* * * directed to any duly constituted policeman, constable or police officer authorizing him to search * * * and to seize any property found liable to seizure * * *." Allen Buckner relied on this statute in objecting below and relies on it on appeal in arguing that the seizure of the box and its contents was illegal. The warrant was directed to a duly constituted police officer—"any officer of the Maryland State Police"—and was executed by a duly constituted police officer — Sergeant Grant of the Maryland State Police. The search of the bedroom was under the personal and immediate direction of Grant and the contents [8] of the box were seized by Grant. In these circumstances that Stewart was not a duly constituted policeman, constable, or police officer did not invalidate the search and seizure. In overruling the objection the lower court said: "* * * Sergeant Grant was in the room conducting the search. The fact that Mr. Stewart pulled out a box and put it on the bed in Sergeant Grant's presence, I don't think would invalidate the search and seizure." We agree.[9]

## IV

Appellants contend that the search of Allen Buckner's bedroom and the search of a bedroom occupied by Joyce Buckner [10] were unreasonable. The warrant commanded

---

8. There was cash in the amount of approximately $11,500 in the box wrapped in bundles.

9. In the factual posture here we need not reach a determination as to who may be "necessary and proper assistants" to aid a policeman, constable or police officer to whom a warrant is directed.

10. About $81,000 was found in a box in the bedroom occupied by Joyce Buckner. Myron Buckner told the police "the money belonged to him, that it was all his, and that the girl had nothing to do with it."

the search of the premises 448 Columbia Road. It was clear that these premises were a single family dwelling, not divided into apartments or sub-units. In denying a motion below to suppress the property found in the bedrooms occupied by Joyce Buckner and Allen Buckner the court observed that the point was whether a search under a validly issued search warrant was required to stop short of certain parts of premises because they are occupied by other members of the family. The court said that the search was pursuant to a warrant which described the premises and the police had the right to search the entire premises. "The fact that a family was living there as a unit didn't mean that they were precluded from going into the entire premises." It found that because the various people in the family lived in various rooms of the house did not prohibit the police from searching those rooms under the warrant. We agree. Cases involving apartments and sub-units are not apposite in the factual posture of the case here. See *Ferguson v. State,* 236 Md. 148; *Hall v. State,* 232 Md. 588; *Frey v. State, supra.* We hold the lower court did not err in denying the motion to suppress.

## V

Appellants contend that any search beyond the immediate person of Myron Buckner was exploratory and therefore invalid. They cite *United States v. Rabinowitz,* 339 U. S. 56 as holding that a search incident to a valid arrest could only be made in the area under the immediate control of the arrestee.[11] *Rabinowitz* is in nowise apposite. The question there was "the reasonableness of a search without a warrant of a place of business consisting of a one-room office, incident to a valid arrest." At 57. There is no question here of the scope of a warrantless search incident to a legal arrest. Here the search

---

11. Actually what *Rabinowitz* came to stand for was that a warrantless search incident to a lawful arrest may generally extend to the area that is considered in the possession or under the control of the person arrested. *Chimel v. California,* 395 U. S. 752, 760. *Chimel* rejected that proposition. At 768. See *Scott v. State,* 7 Md. App. 505.

was under the authority of a search and seizure warrant which directed a search of the premises. Myron Buckner was searched in the living room and thereafter Grant searched the dining room. Appellants' claim that Grant "had no business in the dining room and his intrusion therein was unreasonable since there was nothing going on illegal in the living room" is without merit.

> *As to Myron Saul Buckner appeal dismissed;*
> *as to Allen Myron Buckner, individually, Lydia Buckner and Joyce Buckner: judgments affirmed;*
> *costs to be paid by appellants.*