# MICHAEL ASHTON EVERHART *v.* STATE OF MARYLAND

[No. 118, September Term, 1973.]

*Decided February 13, 1974.*

72

73

The cause was argued before MORTON, MOYLAN and MOORE, JJ.

*Frederick R. Joseph*, with whom were *Feissner, Kaplan, Smith, Joseph & Greenwald* and *William Leckemby* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General*, and *Robert*

S. *Rothenhoefer, State's Attorney for Frederick County*, on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The exclusionary rule of evidence, a child of controversy since its birth in 1901, has always played to at-best mixed reviews. The present appeal by Michael Ashton Everhart from his conviction by a Frederick County jury, presided over by Judge Samuel Barrick, of 1) maintaining a common nuisance and 2) possession of marihuana prompts a first-impression consideration of the applicability of that exclusionary rule to the *ex parte, in camera* proceeding wherein a magistrate determines that probable cause exists for the issuance of a search and seizure warrant.

We will set the stage procedurally. On May 11, 1972, Sergeant Carl R. Harbaugh of the Maryland State Police applied for a search warrant to search 1) coincidentally, a 1966 Lincoln Continental owned by one Jerry Wayne Lawson, and 2) of primary concern, a farmhouse (particularly described and located) on the outskirts of Frederick known as "the Nathan Doody farm." The probable cause was set out fully in the four and one-half page application. District Court Judge Byron Thompson issued the warrant. The resultant search was executed on May 19, 1972. The inventory of approximately 200 items seized consumed four and one-half closely typewritten pages. Included was a broad variety of regular pipes, water pipes, bamboo pipes, numerous scales, weights, eyedroppers, gelatin capsules and baggies, measuring spoons and syringes, hypodermic needles, wire screens, homemade cookers, cherry incense and incense candles, a veritable rainbow of colored pills, cigarette papers, myriad evidence of marihuana and seventy-seven marihuana plants.

The two-count indictment against the appellant was handed down on June 22, 1972. The appellant filed an essentially three-point Motion to Suppress on September 18, 1972. On September 25, 1972, a full hearing was conducted on the motion by Judge Barrick. By Memorandum and Order of Court, filed on September 29, 1972, the Motion to

Suppress was denied. The first of the appellant's eight contentions goes to that denial.

The point, in this regard, which the appellant now makes, and to which we will therefore confine our analysis, is not that there was any procedural infirmity in the suppression hearing but only that "there was no probable cause for the issuance of the search warrant." Focusing the issue still more narrowly, the precise question is whether there was probable cause for the search of "the Nathan Doody farm."

As to the person of Jerry Wayne Lawson and as to his 1966 Lincoln Continental, there was probable cause in abundance. On April 12, 1972, an undercover agent of the Federal Bureau of Narcotics spoke to Lawson, standing beside his Lincoln, on the parking lot of a Frederick bowling alley. Lawson agreed to sell the agent $50 worth of heroin later that evening. At 8 p.m. that evening, the undercover agent met Lawson by appointment on the same parking lot, and was informed by Lawson that he could not obtain heroin on that day but "would be obtaining some at a later date and the transaction would then be made." While awaiting the arrival of Lawson on that evening, the undercover agent met several known and suspected drug abusers who indicated that they were also waiting to contact Lawson in order to purchase drugs. On April 22, 1972, two Frederick City policemen, while maintaining surveillance on the above-mentioned parking lot, observed Lawson in his 1966 Lincoln Continental and observed one Dorothy May Boyd, a known and convicted heroin addict, make frequent short visits to the Lincoln. A second known and convicted heroin addict, designated by name, was seen to make brief contact with Lawson and with the Lincoln. The warrant application mentioned further that Lawson had pleaded guilty to a narcotics violation in July, 1970. What remained to be established in the warrant application was the nexus between Lawson and his 1966 Lincoln Continental, on the one hand, and the Nathan Doody farm, on the other hand.

Three references were made in the warrant application to the farm. One was this:

"That on May 2, 1972 Joe Lewis Petty, a known

> heroin addict, and distributor, was arrested and charged with several Breaking, Entering, and Larcenies; And

> During the course of the investigation, while conversing with your Affiant and other State Police Officers the said Joe Lewis Petty stated he visited the aforesaid Jerry Wayne Lawson on May 1, 1972 at the previously described two story dwelling, located on the Nathan Doody farm, south of State Route 26, in an effort to 'make a deal' concerning purchases of heroin . . ."

Although that information did not necessarily point to the farm as the hiding place or "stash" of the contraband drugs, it did go toward establishing some nexus between Lawson himself and the farm. The information came, to be sure, from a secondary source. There is no problem with the "basis of knowledge" prong of *Aguilar v. Texas*, 378 U. S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723 (1964), since the secondary source explicitly spoke from firsthand knowledge. We are persuaded, moreover, that there is little, if any, problem with the "veracity" prong of *Aguilar*. Significantly, the secondary source is not anonymous but named — "Joe Lewis Petty." It appears, furthermore, that he was not a regular police informant but was a defendant, arrested and charged, who was making admissions under police interrogation. As such, he would appear to have been making a genuine "declaration against penal interest" such as to satisfy not simply the plurality of the Supreme Court in *United States v. Harris*, 403 U. S. 573, 91 S. Ct. 2075, 29 L.Ed.2d 723 (1971), but even the four-man minority represented by Justice Harlan. See *Stanley v. State*, 19 Md. App. 507, 313 A. 2d 847, n. 8. The independent information, developed directly by the police, confirming that Lawson dealt in drugs, verified, moreover, in significant measure the story told by this informant and, therefore, bolstered his "veracity" under the augmentation technique spelled out in *Spinelli v. United States*, 393 U. S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637 (1969), if his "veracity" arguably needed any such bolstering.

The second reference to the farm was:

> "That on May 6, 1972 the previously mentioned past proven, confidential and reliable informant advised your Affiant that prior to the arrival of the aforementioned Tfc. John W. Reburn and Det. Lt. Paul W. Mossburg, the said Jerry Wayne Lawson had sold heroin to a known drug user;"

Although, from an earlier reference to that same informant (not Joe Lewis Petty), his marginal "veracity" might have been establishable under a combination of *Aguilar* and *Spinelli*, his "basis of knowledge" for the reference to the farm was in no event set forth, either explicitly or implicitly, and will not be considered by us in weighing the probable cause as to the farm.

The third reference made in the warrant application to the farm — the information which goes to the heart of the appellant's present contention — was as follows:

> "That on May 4, 1972, Tfc. John W. Reburn, Maryland State Police, and Detective Lieutenant Paul W. Mossburg, Frederick City Police Department, went to the aforesaid two story dwelling located on the Nathan Doody farm south of State Route 26 and obtained a large amount of narcotic and restricted drugs that had been reported stolen from the Parkview Medical Center on May 3, 1972; And
>
> That the aforesaid Jerry Wayne Lawson was present at the aforementioned two story dwelling at the time officers obtained the stolen drugs;"

The appellant mounted a strenuous attack upon this information on the ground that it was come by in the course of an unconstitutional search and seizure. Judge Barrick found it unnecessary to decide whether the information was legitimately in the probable cause equation. In his Memorandum and Order denying the Motion to Suppress, he found the information superfluous:

> "Assuming without deciding that part of the

drugs seized on May 4, 1972, are not admissible in evidence, that alone will not suffice in determining probable cause in the issuance of the search warrant. The inadmissibility of that part of the evidence at trial would not warrant the suppression of all the evidence on the theory that there was not probable cause for the issuance of the search warrant. If we were to exclude that part of the evidence allegedly illegally seized, there is still more than ample facts in the application to establish probable cause for the issuance of the search warrant. The application and affidavit outlined numerous facts on which Judge Thompson had probable cause for effecting a search warrant for the 1966 Lincoln Continental and the dwelling located on the Nathan Doody farm."

Upon our constitutionally mandated, independent review, we are not persuaded that the information was superfluous. Although purely redundant as to the person of Lawson himself, and silent as to his 1966 Lincoln Continental, it is the hard core of probable cause going to the farm. We believe, however, that the information was legitimately in the probable cause equation.

The suppression hearing went, of course, to the legitimacy of the May 19th search and seizure, the fruits of which were the primary evidence against the appellant. The appellant's cry of "foul" went not to the May 19th search itself, but rather to the earlier police conduct of May 4 which contributed to the probable cause for the May 19th search. It is important initially to put the issue before us in procedural perspective.

### "Fruit of the Poisonous Tree" Doctrine Is Not the Issue

We are dealing with a proper invocation by the appellant of "the fruit of the poisonous tree" doctrine.[1] He did not

---

1. Initially articulated by Justi :e Holmes in *Silverthorne Lumber Company v. United States,* 251 U. S. 385, 40 S. Ct. 182, 64 L. Ed. 319 (1920); christened with its present name by Justice Frankfurter in *Nardone v. United States,* 308 U. S. 338, 60 S. Ct. 266, 84 L. Ed. 307 (1939), and fully

move, after learning of the police action of May 4, promptly to demand the return of the seized property and to enjoin its use directly or derivatively. He did not seek a "taint hearing" to establish a primary illegality, shifting the burden to the State to attenuate that taint before using the fruits even derivatively. Even if we were to assume that a proper protest could be lodged as remotely as two steps removed from the ostensible primary taint,[2] the very tentative effort to establish a primary taint was in no event preserved for appellate review. The appellant half-heartedly offered to produce a witness, apparently to show that the police action of May 4 was both warrantless and nonconsensual. When the hearing judge, however, declined to hear from the witness, the appellant completely acquiesced:

"Joseph: . . . I think it might be helpful at this point if the Court wishes to hear from Mr. Lawson as to what happened on that May 4th date that we should put it into the record.

Court: I am not sure that it is even permissible at this time. I don't think I can take evidence on the search warrant as you mentioned that you have got to look at the search warrant, at the four corners of it and decide from that.

Joseph: Okay, fine. I can understand the Court's ruling."

One further reference to the possibility of calling

developed in *Wong Sun v. United States*, 371 U. S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963). Its literature is rich: Pitler, *"The Fruit of the Poisonous Tree" Revisited and Shepardized*, 56 Cal. L. Rev. 579 (1968); Bernstein, *The Fruit of the Poisonous Tree: A Fresh Appraisal of the Civil Liberties Involved in Wiretapping and Its Derivative Use*, 37 Ill. L. Rev. 99 (1942); Maguire, *How to Unpoison the Fruit — The Fourth Amendment and the Exclusionary Rule*, 55 Journal of Criminal Law, Criminology, and Police Science 307 (1964); Note, *Fruit of the Poisonous Tree — A Plea for Relevant Criteria*, 115 Pa. L. Rev. 1136 (1967).

2. Even if we were to assume that the police action of May 4 were tainted — to wit, the "poisonous tree" — the fruit thereof was the information there gathered. Those fruits were used on May 11 in the application for the search and seizure warrant. The result of that use was the search of May 19. The yield of the May 19th search was not "the fruit of the poisonous tree" but, at best, "the fruit of the fruit of the poisonous tree."

witnesses, for the apparent purpose of establishing a primary taint, was even more diffident:

> "Court: All right, anything further, gentlemen?
>
> Joseph: Your Honor, I would ask the Court — ask permission of the Court to include in the file the copy of the application so that we can include this in the record for purposes of this hearing.
>
> Court: Well, this will be, of course, put in the record.
>
> Joseph: As I understand it, the Court does not desire to have further factual statements or any factual statements, that the defense call the police officers to reiterate what happened on May 4 or to call the defendants to reiterate from their standpoint?
>
> Court: Well, at this stage of the proceedings, it is the Court's opinion that I should not take testimony and that I should review the application of the search warrant and make a decision of what appears in the four corners of the application. Now, do you have any law to the contrary?
>
> Joseph: Your Honor, counsel's understanding is similar to the Court's, but I just wanted to make sure that the Court — to make sure that I understood the Court's position in that regard.
>
> Court: That is my position.
>
> Joseph: Thank you."

It is, therefore, quite clear that we are not, in the posture of this case, dealing with a "fruit of the poisonous tree" situation. The attack, rather, is directly upon the determination of District Court Judge Byron Thompson on May 11 to issue the search and seizure warrant. The attack goes simply to the question of whether there was sufficient "probable cause" spelled out in the application to serve as predicate for the warrant.

*Measuring Probable Cause and Negating Possible Illegality*

The appellant directs his attack at the facial validity of the warrant itself. He argues that the application fails to add up to probable cause because the recital of the May 4th incident did not *per se* negate the possibility of a Fourth Amendment violation. He argues that that failure requires the automatic factoring out of the May 4th allegation from the probable cause equation, resulting in its facial insufficiency. The focus of the attack is made very clear in the appellant's brief:

> "Are there any allegations presented to inform the Magistrate as to the circumstances of this obtaining of narcotic and restricted drugs? Are there any statements presented indicating that this seizure resulted from a warrantless search? In fact, the circumstances of the seizure are clearly nonexistent, and, therefore, the Magistrate was placed in a position whereby he was required to speculate, or guess, as to what facts were involved in this action on May 4, 1972. It should be emphasized that to permit a single, unsupported allegation to establish probable cause for a subsequent search and seizure, results in a situation whereby any type of illegal activity, although not used in a criminal proceeding itself, will be sufficient to provide foundation for future prosecution. To permit the State to do indirectly what it is forbidden to do directly, is clearly contrary to the fundamental precepts of 'law and order' and violates the Appellant's basic constitutional rights."

Thus, the attack upon the warrant at the suppression hearing was confined to a review of its surface sufficiency. We are not here dealing with an attempt, at the reviewing level, to delve below the surface of a facially sufficient affidavit. The law as to whether and how such attempts shall be made is far from settled. In its one opportunity to deal with the

subject in *Rugendorf v. United States*, 376 U. S. 528, 84 S. Ct. 825, 11 L.Ed.2d 887 (1964), the Supreme Court left the matter unresolved. In parrying charges that the facts contained in a warrant application are untrue, Maryland has always flatly rejected the notion that a reviewing court — at the hearing level, trial level or appellate level — could look "beyond the four corners of the affidavit." *Smith v. State*, 191 Md. 329, 335, 62 A. 2d 287.[3] But see *United States v. Thomas*, 14 Cr. L. 2317 (5th Cir., 1973); *United States v. Carmichael*, 14 Cr. L. 2128 (7th Cir., 1973).[4] As the Annotation, "Search warrants: Disputing matters stated in supporting affidavit," 5 A.L.R.2d 394 (1949), based on the Maryland prototype case of *Smith v. State, supra*, points out, the majority of American state courts hold, with Maryland, that warrant review should not look "beyond the four corners of the affidavit." As that same Annotation points out further, however, disputing the accuracy of the supporting information is not the same thing as disputing the legality of the means by which that information was obtained.[5] The Annotation, at p. 395, makes this distinction:

> "Nor is the annotation concerned with the right to show that the averments in a supporting affidavit consisted of information obtained in an illegal manner."

---

**3.** And see *Tischler v. State*, 206 Md. 386, 111 A. 2d 655; *Burrell v. State*, 207 Md. 278, 113 A. 2d 884; *Henderson v. State*, 243 Md. 342, 221 A. 2d 76; *Tucker v. State*, 244 Md. 488, 224 A. 2d 111; *Scarborough v. State*, 3 Md. App. 208, 238 A. 2d 297; *Scott v. State*, 4 Md. App. 482, 243 A. 2d 609; *Hall v. State*, 5 Md. App. 394, 247 A. 2d 548; *Grimm v. State*, 6 Md. App. 321, 251 A. 2d 230; *Buckner v. State*, 11 Md. App. 55, 272 A. 2d 828; *Edwards v. State*, 13 Md. App. 546, 284 A. 2d 10; *Johnson v. State*, 14 Md. App. 721, 288 A. 2d 622; *Hudson v. State*, 16 Md. App. 49, 294 A. 2d 109; *Collins v. State*, 17 Md. App. 376, 302 A. 2d 693; *Hignut v. State*, 17 Md. App. 399, 303 A. 2d 173.

**4.** See also Kipperman, *Inaccurate Search Warrant Affidavits As A Ground for Suppressing Evidence*, 84 Harv. L. Rev. 825 (1917); Comment, *The Outwardly Sufficient Search Warrant Affidavit: What If It's False?* 19 U.C.L.A. L. Rev. 96 (1971); Forkosh, *The Constitutional Right to Challenge the Content of Affidavits in Warrants Issued Under the Fourth Amendment*, 34 Ohio State L. J. 297 (1973).

**5.** Maryland has always felt that a prosecution for perjury is an adequate remedy for, and therefore an adequate deterrent against, the knowing false statement by a warrant applicant. *Scarborough v. State, supra*. The arguments and authorities supporting such a position are well-marshalled in *State v. Petillo*, 61 N. J. 165, 293 A. 2d 649 (1972).

Maryland has never addressed itself to that distinct proposition, and, in the procedural posture of this case, it is unnecessary for us to resolve it anticipatorily.[6]

The appellant's position seems to be that an item of incriminating information in a warrant application must be excluded from consideration, if the issuing magistrate questions, or should have questioned, the constitutional propriety of the means by which the information was obtained. The position is, perforce, that where some question might arise and where the application is silent as to means, the means are presumptively unconstitutional; absent a full recitation by the law enforcement officers negating such possible unconstitutionality, the exclusionary rule must bar consideration of the suspect information. Such a position is totally untenable for a number of reasons.

## The Exclusionary Rule Is Not Mandated

There is no clear constitutional mandate imposing an exclusionary rule of evidence upon the *ex parte* consideration by a magistrate of whether probable cause exists to justify the issuance of an arrest or search and seizure warrant. At the common law, no exclusionary rule of evidence obtained and, even today, the device is unknown in the common law world outside the United States. *Wolf v. Colorado*, 338 U. S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949). Maryland followed that common law rule and would not exclude even from a trial upon the merits trustworthy and relevant physical evidence, notwithstanding that it was come by in an illegal or unconstitutional fashion. *Meisinger v. State*, 155 Md. 195, 141 A. 536. In 1929, the Maryland

---

6. See, however, Annotation, "Previous illegal search for or seizure of property as affecting validity of subsequent search warrant or seizure thereunder," 143 A.L.R. 135 (1943); Annotation, " 'Fruit of the poisonous tree' doctrine excluding evidence derived from information gained in illegal search," 43 A.L.R.3d 385 (1972). And see generally the law on "the fruit of the poisonous tree" doctrine itself, partially catalogued in n. 1 above. In *Washburn v. State*, 19 Md. App. 187, 201-202, 310 A. 2d 176, we discussed the problem, in the limited context of an illegal wiretap, but did not ultimately have to resolve it. The Court of Appeals in *Manger v. State*, 214 Md. 71, 74, 133 A. 2d 78, also found it unnecessary to resolve the issue, again in a wiretap setting.

Legislature passed the Bouse Act, applying a limited exclusionary rule of evidence. Where evidence was obtained by a search of seizure "prohibited by the Declaration of Rights of this State," such evidence was barred from *"the trial* of misdemeanors." A number of misdemeanors, such as carrying concealed weapons, possessing narcotics, and even gambling violations in a number of specific counties, were exempted from the operation of even this limited exclusionary rule. The rule, moreover, applied only to exclude evidence from "the trial." In the wake of *Mapp v. Ohio*, 367 U. S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961), Maryland was forced to apply the exclusionary law more broadly, but applied it only to the extent mandated by *Mapp*. *Mulcahy v. State*, 221 Md. 413, 158 A. 2d 80; *Belton v. State*, 228 Md. 17, 178 A. 2d 409.[7]

The *Mapp* decision dealt only with the admissibility of unconstitutionally seized evidence at the trial upon the merits. Its holding was so limited. Absent a mandate under *Mapp*, we are thrown back upon preexisting Maryland law and common law, neither of which would exclude relevant and trustworthy information from a probable cause determination.

Admitting that it is doctrinally niggardly to look to the facts of *Mapp* for its square holding rather than to feel for its "radiations," "emanations" and "penumbra," let us look then to the Supreme Court not only for clear commands, but for trends. The discernible trend seems to be a retreat from the exclusionary rule.

Recognizing with Wigmore that the exclusionary rule "rest[s] on no purpose of improving the search after truth but on the willingness to yield to requirements of extrinsic policy," the Supreme Court in *Mapp*, in *Elkins v. United States*, 364 U. S. 206, 80 S. Ct. 1437, 4 L.Ed.2d 1669 (1960), and in *Linkletter v. Walker*, 381 U. S. 618, 85 S. Ct. 1731, 14 L.Ed.2d 601 (1965), set forth that extrinsic policy as that of "general deterrence." The avowed purpose was not remedial,

---

7. *See* Comment, *Unreasonable Searches and Seizures and the Admissibility of Evidence in Maryland*, 21 Md. L. Rev. 321 (1961).

but deterrent. It was not to vindicate the rights of any aggrieved party, but rather "to police the police." Since physical evidence is inherently trustworthy, the Supreme Court has recognized that it pays a price in terms of the search for truth in order to serve its other, prophylactic purpose. Some justices have been loath to pay the price at all. See Chief Justice Burger in dissent in *Bivens v. Six Agents*, 403 U. S. 388, 91 S. Ct. 1999, 29 L.Ed.2d 619 (1971). He there said, at 403 U. S. 418:

> "Suppressing unchallenged truth has set guilty criminals free but demonstrably has neither deterred deliberate violations of the Fourth Amendment nor decreased those errors in judgment that will inevitably occur given the pressures inherent in police work having to do with serious crimes."

See also *Coolidge v. New Hampshire*, 403 U. S. 443, 490-491, 91 S. Ct. 2022, 29 L.Ed.2d 564, 597 (concurring opinion by Harlan, J.).

Although *Harris v. New York*, 401 U. S. 222, 91 S. Ct. 643, 28 L.Ed.2d 1 (1971), dealt with a Fifth Amendment rather than a Fourth Amendment overstepping by the police, the treatment of the exclusionary rule by the Supreme Court is instructive. There, police interrogation techniques clearly violated a defendant's right against compulsory self-incrimination under *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). The Court affirmed that the exclusionary rule would be invoked to bar the use of such evidence in the State's case in chief. It recognized again, however, that it was paying a price in the search for truth in order to achieve the extrinsic purpose of deterring police illegality. In balancing those equities, the Court concluded that it would achieve enough deterrence by barring the State from offering the unconstitutionally obtained evidence in its case in chief at the trial on the merits. It declined to extend the exclusionary rule even to the rebuttal phase of the trial itself, where the trustworthy, though unconstitutionally obtained, evidence was valuable

in rebutting possibly perjurious defense testimony. The Court said, at 401 U. S. 225:

"Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief."

The Court conditioned its limitation upon the operation of the exclusionary rule upon the fact that the evidence under scrutiny was trustworthy. It said, at 401 U. S. 224:

"It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards."

In the Fourth Amendment area, no problem in this regard is presented, because the physical evidence is unquestionably trustworthy.

In *Harris*, the Court relied heavily on *Walder v. United States*, 347 U. S. 62, 74 S. Ct. 354, 98 L. Ed. 503 (1954), where evidence seized in violation of the Fourth Amendment, and therefore inadmissible in a federal trial since 1914 under *Weeks v. United States*, 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, as far as the case in chief is concerned, was nevertheless admitted for collateral impeachment purposes.

The most recent and enlightening indication of the extremely chary attitude of the Supreme Court toward the exclusionary rule is *United States v. Calandra*, 14 Cr. L. 3061. Calandra had been subjected to an unconstitutional search and seizure. A suppression hearing ruled in his favor that the search warrant in question had been issued without probable cause and, further, that the search had exceeded the scope of the warrant. All seized property was ordered returned to Calandra. Notwithstanding that adjudicated unconstitutionality, a grand jury had summoned Calandra and had questioned him about the seized evidence. The

Federal District Court and the Court of Appeals for the Sixth Circuit ruled that Calandra could not be questioned on the basis of the unlawful search and seizure. The Supreme Court reversed, holding that the exclusionary rule had no applicability to a grand jury proceeding. It squarely held that "the fruit of the poisonous tree" doctrine had no applicability even where the poisoned fruit was the predicate for grand jury indictment. The Court, through Justice Powell, said at 14 Cr. L. 3063:

> "Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence, *Costello v. United States, supra; Holt v. United States,* 218 U. S. 245 (1910), or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination, *United States v. Lawn,* 355 U. S. 339 (1958)."

The Court again evidenced its hesitancy about extending the application of the exclusionary rule backward from the trial itself to other proceedings. It said, at 14 Cr. L. 3064:

> "Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally-seized evidence in all proceedings or against all persons. As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served."

Indeed, this Court anticipated the Supreme Court by several months with our ruling in *Hopkins v. Maryland,* 19 Md. App. 414, 311 A. 2d 483, that "That an indictment is founded on tainted evidence is no ground for dismissal. . . ."

## The Exclusionary Rule Is Not Desired

Absent a clear mandate from the Supreme Court, the question recurs of whether Maryland, as a matter of judicial policy, should opt for the exclusionary rule when a

88

magistrate makes his determination of whether probable cause exists to justify the issuance of a search warrant.

We are persuaded that too much by way of relevant and trustworthy evidence would be lost, with no countervailing gain in police deterrence. Broad empirical studies have revealed no evidence to support the claim that the exclusionary rule actually deters illegal conduct by law enforcement officials. See Oaks, *Studying the Exclusionary Rule in Search and Seizure,* 37 U. Chi. L. Rev. 665 (1970).

We are, moreover, persuaded by some of the great anti-exclusionary rule champions that the loss in the search for truth is inordinate to the speculative extrinsic gain. In declining to adopt the exclusionary rule in New York, even at the trial upon the merits, Judge (later Justice) Cardozo in *People v. Defore,* 242 N. Y. 13, 21, 23-24, 150 N. E. 585, 587, 588 (1926), characterized the effect of the exclusionary rule in the following terms:

> "The criminal is to go free because the constable has blundered. . . . A room is searched against the law, and the body of a murdered man is found. . . . The privacy of the home has been infringed, and the murderer goes free."

We are persuaded by the words of Justice Jackson, speaking for the Supreme Court in *Irvine v. California,* 347 U. S. 128, 136-137, 74 S. Ct. 381, 385, 98 L. Ed. 561, 571 (1954):

> "Rejection of the evidence does nothing to punish the wrong-doing official, while it may, and likely will, release the wrong-doing defendant. It deprives society of its· remedy against one lawbreaker because he has been pursued by another. It protects one against whom incriminating evidence is discovered, but does nothing to protect innocent persons who are the victims of illegal but fruitless searches. The disciplinary or educational effect of the court's releasing the defendant for police misbehavior is so indirect as to be no more than a mild deterrent at best."

The fundamental inappropriateness of the exclusionary rule was probably best captured by Dean Wigmore, in 8 *Wigmore on Evidence* (3d Ed., 1940), § 2184, p. 40, in his famous parody of the courts as they apply the rule:

"Titus, you have been found guilty of conducting a lottery; Flavius, you have confessedly violated the Constitution. Titus ought to suffer imprisonment for crime, and Flavius for contempt. But no! We shall let you *both* go free. We shall not punish Flavius directly, but shall do so by reversing Titus' conviction. This is our way of teaching people like Flavius to behave, and of teaching people like Titus to behave, and incidentally of securing respect for the Constitution. Our way of upholding the Constitution is not to strike at the man who breaks it, but to let off somebody else who broke something else."

The competing nature of the equities was vividly captured in Amsterdam, *Search, Seizure, and Section 2255: A Comment,* 112 U. of Pa. L. Rev. 378 (1964), at 388-389:

"The rule is unsupportable as reparation or compensatory dispensation to the injured criminal; its sole rational justification is the experience of its indispensability in 'exert[ing] general legal pressures to secure obedience to the Fourth Amendment on the part of federal law-enforcing officers.' As it serves this function, the rule is a needed, but grudgingly taken, medicament; no more should be swallowed than is needed to combat the disease. Granted that so many criminals must go free as will deter the constables from blundering, pursuance of this policy of liberation beyond the confines of necessity inflicts gratuitous harm on the public interest as declared by Congress.

Let me put the case another way. In every litigation in which exclusion is in issue, a strong public interest in deterring official illegality is balanced against a strong public interest in

convicting the guilty. As the exclusionary rule is applied time after time, it seems that its deterrent efficacy at some stage reaches a point of diminishing returns, and beyond that point its continued application is a public nuisance."

For other expressions of disenchantment with the exclusionary rule or discussion of the limitations upon its effectiveness, see *State v. Bisaccia,* 45 N. J. 504, 213 A. 2d 185 (1965) (opinion by Weintraub, C. J.); Friendly, *The Bill of Rights as a Code of Criminal Procedure, 53 Calif. L. Rev. 929, 951-54 (1965); LaFave, Improving Police Performance Through the Exclusionary Rule,* 30 Mo. L. Rev. 391, 566 (1965); Schaefer, *The Fourteenth Amendment and Sanctity of the Person,* 64 Nw. U.L. Rev. 1 (1969).

### Inappropriateness of the Exclusionary Rule at a Probable Cause Determination

Whatever value the exclusionary rule may arguably have at a trial upon the merits, it is clear to us that it has no place when a magistrate makes his *ex parte, in camera* determination that the police application for a search warrant contains adequate probable cause to believe that a particular place or thing contains evidence of crime. The very purpose and nature of the proceeding make it peculiarly inappropriate.

The warrant requirement does not envision an adversary proceeding. Its fundamental purpose is simply to interpose the "neutral and detached magistrate" between the policeman and his quarry. The reason for the rule was made clear in *Johnson v. United States,* 333 U. S. 10, 13-14, 68 S. Ct. 367, 92 L. Ed. 436, 440 (1948):

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the

officer engaged in the often competitive enterprise
of ferreting out crime."

It is not contemplated that the magistrate will anticipate, raise *sua sponte* and then proceed to resolve possibly inherent constitutional defects. His is to make the same raw quantitative judgment that a policeman might otherwise make — the vital protection being that the raw quantitative judgment is being made by a "neutral and detached" umpire or referee rather than by one of the players involved in the game.

Our classic definitions of probable cause speak not in terms of "admissible evidence" or of "constitutional unsullied evidence," but only in terms of what a given set of facts would mean to "reasonable and prudent men." No word is said as to how those facts are come by. The fundamental definition of probable cause today is that contained in *Brinegar v. United States*, 338 U. S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879, 1890 (1949):

> "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.
>
> 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' "

*Smith v. State, supra,* says, at 191 Md. 338, "The facts alleged to show probable cause are sufficient if they are such as to warrant a prudent and cautious man in believing that the offense has been committed." *Frankel v. State,* 178 Md. 553, 557, 16 A. 2d 93, holds, "[I]f the observation of the premises by the officers as disclosed by the application was sufficient to justify the belief in a rationally minded person that the law was there being violated, the existence of probable cause as contemplated by the statute is satisfied." *Buckner v. State,* 11 Md. App. 55, 61, 272 A. 2d 828, says, "If

a prudent and cautious man would be justified from the facts presented in the affidavit in believing that the offense has been or is being committed, the warrant properly may be issued."

The Supreme Court has consistently told us that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial. *McCray v. Illinois,* 386 U. S. 300, 311, 87 S. Ct. 1056, 18 L.Ed.2d 62, 70 (1967), cited with approval in *Spinelli, supra.* It was precisely to this point which *Brinegar* addressed itself, at 338 U. S. 173:

> "There is a large difference between the two things to be proved, as well as between the tribunals which determine them, and therefore a like difference in the *quanta* and modes of proof required to establish them.
>
> For a variety of reasons relating not only to probative value and trustworthiness, but also to possible prejudicial effect upon a trial jury and the absence of opportunity for cross-examination, the generally accepted rules of evidence throw many exclusionary protections about one who is charged with and standing trial for crime. Much evidence of real and substantial probative value goes out on considerations irrelevant to its probative weight but relevant to possible misunderstanding or misuse by the jury."

In judging the facial sufficiency of the probable cause affidavit at hand, we hold that the District Court judge was entitled to consider the allegation of the policemen that they had obtained "a large amount of narcotic and restricted drugs" from the Nathan Doody farm on May 4. The District Court judge was not required to raise the possibility that the policemen had perpetrated a Fourth Amendment intrusion and, therefore, to factor the information out of the probable cause equation, if the affidavit did not negative such a possibility. If such a requirement were part of our Fourth Amendment law, the problems that could fly from

such a Pandora's box would be legion. A policeman might allege that a suspect had a prior criminal record; would he be required to establish "aid and assistance of counsel" under *Burgett v. Texas*, 389 U. S. 109, 88 S. Ct. 258, 19 L.Ed.2d 319 (1967)? A policeman might allege that a robbery victim had selected a photograph of the suspect, for whose home a warrant was being sought; would he be required to negative "impermissive suggestiveness" under *Simmons v. United States*, 390 U. S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247 (1968)? A policeman might allege a confession by the suspect or by a codefendant; would he be required to negative a violation of *Miranda v. Arizona, supra*? The problems would be infinite, and the mischief overwhelming.

We believe that what the Supreme Court said in *Calandra*, at 14 Cr. L. 3063, with respect to the *ex parte* nature of a grand jury investigation is equally applicable to the *ex parte* determination by a magistrate of probable cause:

> "A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person."

1 *Wigmore on Evidence* (3d Ed., 1940), § 4 (3), "Rules in Ex Parte Proceedings," put the matter more fundamentally, at p. 19:

> "Evidence is constantly being offered to a judge in establishing the grounds of a motion made and heard 'ex parte' only. In such cases the usual system of rules of Evidence is not applied, partly because there is no opponent to invoke them, partly because the judge's determination is usually discretionary, partly because it is seldom final, but mainly because the system of Evidence rules was devised for the special control of trials by jury."

We reiterate that our holding is restricted to a constitutional finding that the probable cause affidavit was

not facially insufficient, and that the warrant-issuing magistrate is not required to raise *sua sponte* possible constitutional problems. We do not intimate what the answer might have been, had the appellant adequately raised at the suppression hearing, and adequately preserved for appellate review, an effort to look behind "the four corners of the affidavit" in order to establish some primary taint, and then to apply the exclusionary rule to the ostensible fruits of that ostensible taint. We recognize that the whole body of law grown up around the "fruits of the poisonous tree" doctrine, on the one hand, and the discernible and almost tidal retreat from the exclusionary rule by the Supreme Court, on the other hand, are in essential collision.[8] We will not try to predict how that collision may ultimately be resolved.

### *Abandoned Property and Non-Constitutionally Protected Area*

The problem of the earlier, May 4th visit of the police to the Nathan Doody farm also reared its head at the trial upon the merits. The appellant protests against all testimonial evidence relating to that visit. Conviction for maintaining a common nuisance, of course, requires evidence that the *corpus delicti* of "keeping or maintaining, etc." be of a recurrent or continuing character. *Skinner v. State*, 16 Md. App. 116, 124-129, 293 A. 2d 828. To push the pedigree of the nuisance backward in time from the May 19th raid, the police offered their observations made 15 days earlier on May 4. At the trial upon the merits, more surrounding detail fleshed out the observations of May 4 than had been done in the application for the search and seizure warrant.

The observations of May 4 fell into two distinct legal categories, the first of which gives us little difficulty. The

---

8. The observation of Justice Frankfurter, concurring in *Chapman v. United States*, 365 U. S. 610, 618, 81 S. Ct. 776, 5 L.Ed.2d 828, 834 (1961), is appropriate:

"The course of true law pertaining to searches and seizures, as enunciated here, has not — to put it mildly — run smooth."

house in question, leased by the appellant, was essentially a tenant house on the larger Nathan Doody farm. This tenant house was located on the lane that led from the State road to the main farmhouse, which main farmhouse was occupied by Nathan Doody. The tenant house was about one and one-half miles off the main road and approximately 200 yards distant from the main farmhouse.

Det. Lt. Paul Mossburg of the Frederick City Police Department testified that at approximately 8:15 p.m. on May 4, 1972, he went to this tenant house, along with Trooper John Reburn of the Maryland State Police. When the two officers arrived, they drove their car up to the side of the house and noticed an area where trash bags "were all piled in a heap." They noticed that one of the bags was "a light color bluish green plastic bag commonly used by medical people." Lt. Mossburg opened the bag and found a box containing syringes. He found three separate boxes addressed to three separate doctors. One of the boxes contained Dexamyl No. 1, a controlled dangerous substance under Schedule No. 3. A second of the boxes contained Phenergran Expectorant with Codeine, a controlled dangerous substance under Schedule No. 5. A third of the boxes contained Doriden, a tranquilizer and a controlled dangerous substance under Schedule No. 3. Also recovered by Lt. Mossburg was a needle, a syringe and three sections of cotton with a dark stain on one of them. Expert testimony established that bits of cotton are typically used to stop the bleeding after a heroin user has injected heroin intravenously.

With respect to the search of the trash bag and the seizures therefrom, we hold that the property was abandoned and that, therefore, no Fourth Amendment protection was involved. With respect to abandoned property, there is no continuing property interest and no reasonable expectation of privacy. *Abel v. United States*, 362 U. S. 217, 241, 80 S. Ct. 683, 4 L.Ed.2d 668 (1960); *Buettner v. State*, 233 Md. 235, 196 A. 2d 465; *Henderson v. Warden*, 237 Md. 519, 206 A. 2d 793; *Matthews v. State*, 237 Md. 384, 206 A. 2d 714; *Boone v. State*, 2 Md. App. 479, 482, 235 A. 2d 567.

No more so can a trash heap be held to be a constitutionally protected area. Cf. *Hester v. United States*, 265 U. S. 57, 44 S. Ct. 445, 68 L. Ed. 898 (1924). We are not unmindful of *People v. Krivda*, 96 Cal. Rptr. 62, 486 P. 2d 1262, but are not persuaded that any valuable Fourth Amendment interest would be served by extending the coverage of the Amendment to trash and garbage which has been patently discarded.

### Consent, Open View and Harmless Error

The second category of May 4th observations, however, presents a far more ticklish Fourth Amendment problem. After recovering the aforementioned items from the trash pile outside the house, the officers went inside, where Jerry Lawson was present. Putting aside for a moment the question of whether Jerry Lawson actually gave consent, there is no disputing the fact that he had the capacity to consent to the officers entering and looking around the house. He lived with his girlfriend in one of the rooms of the house. He had been in residence since the early part of April. He paid $25 per month as his share of the rent on the total property. The State's theory is that Lawson consented to the police looking around. Lawson took the officers to the second floor and pointed out the room that belonged to the appellant. At that point, however, the capacity of Lawson to consent ran out. In dealing with an analogous situation in *Brown v. State*, 15 Md. App. 584, 292 A. 2d 762, we held that the capacity of a landlady to consent to a police intrusion into her rooming house, though extending to the house at large, stopped at the threshold of the lodger's private bedroom. We there said, at 15 Md. App. 612:

> "For purposes of this appellant's Fourth Amendment rights, his 'constitutionally protected area' — the legitimate boundaries of his 'expectation of privacy' — was the room he rented and not the entire house. The landlady could countenance a prior valid intrusion of police investigators into the house at large, but not into his room. *Stoner v. California*, 376 U. S. 483 (1964); *United States v. Jeffers*, 342 U. S. 48 (1951); *Lustig*

*v. United States*, 338 U. S. 74 (1949); *McDonald v. United States*, 335 U. S. 451 (1948); *Chapman v. United States*, 365 U. S. 610 (1961). The threshold, therefore, that concerns us here — in measuring whether there was or was not a prior valid intrusion — is the threshold to the appellant's room, not the threshold to Mrs. Hall's house. In this case, the relevant threshold had not been crossed, and without a warrant it could not be crossed."

Scrupulously mindful of *Brown v. State*, the officers did not offer any physical evidence seized from the appellant's room and did not offer any observations made from the vantage point of the appellant's room. Lt. Mossburg testified that the door to the appellant's room was open and that certain observations were made from the common hallway. Meticulously restricting himself to what could be seen from the common hallway, Lt. Mossburg described a hypodermic needle, a piece of cotton with red substance on it, some capsules lying on the floor, a green plastic bag similar to the one found in the trash area outside the house, and boxes similar to those recovered outside, which appeared to be the types of boxes which contained needles and medicines. Assuming valid consent, the officers were standing in a place where they had a right to be. From that constitutionally valid vantage point, they were entitled to see anything which could be seen in open view. As far as the legal theory is concerned, we feel as we did in *Brown*, at 15 Md. App. 611-612:

"From the hallway, the Deputy Sheriff looked into the room and saw a cardboard box, unremarkable in itself. The box was sitting on the floor approximately two feet inside the room. The Deputy Sheriff testified that he could see, 'in plain view,' 'the heavy-duty clamps, pipe clamps, and the batteries, which resembled the description of those which were stolen from Parker's, being the same make.' Still from the hallway, he directed the attention of the other two investigators to the box.

. . .

> There is no question but that Mrs. Hall could consent and did consent to the presence of the three investigators in her house. As they were standing in her hallway, they were unquestionably in a place where they had a right to be. From that legitimate vantage point, they were entitled to see whatever could be seen."

The legitimacy of the view from the hallway, however, is contingent, in the first instance, upon the validity of Lawson's consent. For the quality of the consent required, see *Schneckloth v. Bustamonte*, 412 U. S. 218, 93 S. Ct. 2041, 36 L.Ed.2d 854 (1973). No defense testimony was offered negating consent. The law is clear, however, that when "a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U. S. 543, 548, 88 S. Ct. 1788, 20 L.Ed.2d 797 (1968). See also *Johnson v. United States*, 333 U. S. 10, 68 S. Ct. 367, 92 L. Ed. 436 (1948); *Amos v. United States*, 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654 (1921). Trooper Reburn was silent on the issue. The testimony of Lt. Mossburg was studiously unenlightening:

> "A. On May 4th after I examined the bag I went into the house where Trooper Reburn was and talking to Mr. Jerry Lawson . . . At this time he led us up-stairs to a room which was soon to be occupied by the defendant . . .
>
> Q. You were admitted entrance by Mr. Jerry Lawson?
>
> A. Yes, sir.
>
> Q. And after you had been admitted entrance where did you go in this house?
>
> A. Up to the second floor."

Under the circumstances, we are persuaded that the State has not met its burden to "demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, at 36 L.Ed.2d 875.

The intrusive observations of May 4, however, went only to establishing the recurring nature of the common nuisance. They were, in that regard, so merely cumulative as to convince us, beyond a reasonable doubt, that, even though erroneously admitted, they did not contribute to the verdict. Under the circumstances, the error was harmless. *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967). The massive evidence establishing the continuing character of the common nuisance will be discussed in considering the appellant's next contention that the State's evidence was legally insufficient to permit the case to go to the jury on that charge.

### Sufficiency of the Evidence: Common Nuisance Charge

The tenant house in question was uncontrovertedly leased to the appellant. Ronald Doody, brother of Nathan, and business manager for the Doody farm properties, testified that the appellant, responding to a newspaper advertisement, rented the tenant house in early April. He paid Ronald Doody $90 rent for the month of April. Ten to fourteen days later, the appellant paid Ronald Doody $125 in rent for the month of May.

At least six individuals shared the house. Jerry Lawson and Anne Jounen shared a bedroom on the first floor. Wesley Furr and Dorothy Malone shared a bedroom on the second floor to the left of the stairs. On the second floor in the first room to the right of the stairs lived Frances Russell. The appellant's room adjoined Miss Russell's. All of the other occupants paid $25 per month to the appellant, who, in turn, paid the rent to Ronald Doody.

Sgt. Harbaugh testified that he had known Jerry Lawson as "a drug violator here in Frederick County" for a period of two or three years. He knew of the earlier conviction of Lawson for a drug violation. Frances Russell was also known to Sgt. Harbaugh as "a drug violator." Anne Jounen, Dorothy Malone and Wesley Furr all admitted to Sgt. Harbaugh that they were "drug violators." Frances Russell, moreover, testified at the trial that she was a user of

controlled dangerous substances. Dorothy Malone testified that she "smoked pot." Wesley Furr testified that he was a marihuana smoker.

Unlike the situation we were dealing with in *Skinner*, the seizures of May 19 alone would have permitted the reasonable inference that the violations going on in the tenant house, leased by the appellant, were of a continuing and recurring nature. Recovered from the downstairs bedroom of Jerry Lawson and Anne Jounen were, among numerous other items, a set of ohaus scales and ohaus weights, six hypodermic syringes and five needles, 29 seconal pills, a vial of Phenergren Hydrochloride with two hypodermic needles, another plastic bag containing seven hypodermic needles and syringes and two Jelco hypodermic needles, a plastic bag containing marihuana seeds, a brass marihuana pipe bowl, a measuring spoon burned on the bottom, five incense sticks, three homemade cookers (for preparing heroin for intravenous injection), a flour strainer containing marihuana seeds, a jacket containing marihuana seeds in the pocket, two glassine envelopes containing white powder residue, a wooden ashtray with marihuana seeds in it, a brass and plastic marihuana pipe, and an almost infinite variety of variously colored pills. Sgt. Harbaugh testified to the illicit use to which the various instruments would typically be put by drug violators. In an upstairs bedroom used for common storage was a potted marihuana plant. A search of the upstairs room, occupied by Wesley Furr and Dorothy Malone, produced two "alligator clips" for smoking marihuana "down to the last puff," four pipes, two "cookers," two packages of cigarette papers, a hypodermic syringe and needle, a leather pouch containing an eyedropper, syringe and burned spoon, an incense burner, a wire screen, and various pieces of plastic and copper tubing.

From Frances Russell's bedroom were recovered a large plastic marihuana pipe, a green water pipe, an incense burner and incense candles, a white bowl with marihuana seeds, a leather tobacco pouch containing "cookers," various syringes, a marihuana pipe bowl, two marihuana cigarette butts, a purse containing marihuana cigarette butts, a box

containing marihuana cigarette butts, cigarette papers, and various gold, pink and white pills.

From the attic were recovered a homemade brass and copper marihuana pipe, a bamboo marihuana pipe, a water pipe, a tea strainer, a hypodermic syringe and needle, a chrome marihuana pipe bowl, an alligator clip, a burned spoon and a metal marihuana pipe bowl.

A "cooker" was additionally found in the upstairs hallway. Just outside the house were 34 potted marihuana plants. Growing nearby in two small patches were 44 additional marihuana plants. Sgt. Harbaugh estimated that, as of May 19, the bigger plants were from "four to six weeks" old.

In short, from the evidence of May 19 alone, it would not be unreasonable to infer that the violations of that day were not a "one shot" occurrence. See *Hunt v. State*. The State does not have to rely upon that reasonable inference, however.

It was established that all of the other known and admitted drug violators took up residence in the tenant house contemporaneously with the appellant in early April and remained through May 19, although the appellant himself left on or shortly after May 5 because of an arrest on another charge. He was out on bail but did not return to sleep at the tenant house on the farm.

Nathan Doody testified that he observed "periodically a lot of cars going in and out" during "all hours," sometimes as late as 1 a.m. Mrs. Nathan Doody testified that she observed a lot of people going in and out of the tenant house on "every day of the week" and until as late as "2 or 3 o'clock" in the morning. Frances Russell testified that she brought her various narcotics paraphernalia with her to the tenant house when she first moved in, and that the appellant had had a number of occasions to see them when he visited her in her room. She testified further that she had planted the marihuana plants during the middle of April and took care of them. She had discussed them with the appellant and had shown them to him. Dorothy Malone testified that she regularly "smoked pot" on the premises, that she had known the appellant for approximately a year and one-half and that

the appellant knew her to be a marihuana smoker when she first moved into the tenant house. Wesley Furr testified that he regularly smoked marihuana on the premises, and further that both marihuana and heroin had been regularly used on the premises from the time that the new tenants had moved in in April until the date of the raid.

The sufficiency of the evidence to permit the common nuisance charge to go to the jury was, even absent any observations made by the police on May 4, overwhelming.

### Sufficiency of the Evidence: Possession Charge

We do not have any difficulty in holding that there was sufficient evidence of possession of marihuana against the appellant to permit the case to go to the jury. Even ignoring the manifold evidence of marihuana located throughout the various bedrooms in the tenant house and even ignoring the potted marihuana plant found within the house, the evidence relating to the 78 plants found outside the house was sufficient alone to sustain the charge. Frances Russell testified that she planted the marihuana "about the middle of April." She further testified that everyone else, including the appellant, had knowledge of the fact that she had planted the marihuana and was tending it. At one point, she testified:

"Q. What, if anything, did he say when you told him you were growing marijuana plants on the property leased by him?
A. Nothing.
Q. He made no objection?
A. No, sir.
Q. Show any interest in it?
A. He looked at them."

Initially, it is clear that one may be guilty of possession of marihuana even when it is still growing on the vine. *Puckett v. State*, 13 Md. App. 584, 284 A. 2d 252. It is furthermore clear that guilty possession may be joint possession. As we said in *Folk v. State*, 11 Md. App. 508, 511-512, 275 A. 2d 184:

> "The appellant was one of the six occupants of the automobile. The evidence did not establish that she was ever in direct physical possession of the contraband marihuana. The evidence was clear, however, that some person or persons in that automobile were in possession of the contraband marihuana.
>
> It is well-settled that the proscribed possession of marihuana or of narcotic drugs under the Maryland law need not be sole possession. '[T]here may be joint possession and joint control in several persons. And the duration of the possession and the quantity possessed are not material, nor is it necessary to prove ownership in the sense of title.' "

In synthesizing the various Maryland cases that had upheld convictions for joint possession, we pointed out the factors which permit such a finding. We said in *Folk*, at 11 Md. App. 518:

> "The common thread running through all of these cases affirming joint possession is 1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband."

The evidence at bar was legally sufficient to permit the jury to find that the appellant was in joint exclusive control of marihuana throughout the period of time running from mid April through May 19. Judge Barrick was not in error in submitting the case to the jury.

### Reputation of the Tenants as Drug Abusers

The appellant claims that Sgt. Harbaugh should not have

been permitted to testify that, in his opinion, the appellant's five co-tenants were "drug abusers." He objects specifically to the guilty pleas of three of the co-tenants as predicate for the sergeant's conclusion. With respect to Jerry Lawson, Sgt. Harbaugh testified that he had known Lawson as a drug violator in the Frederick area for several years, and that Lawson had been convicted of just such a violation on an earlier occasion. Sgt. Harbaugh had also known Frances Russell as a "drug violator" for some time. He did rely on the admissions, per the guilty pleas, of the other three co-tenants. We note, however, with respect to both Dorothy Malone and Wesley Furr, that they took the stand themselves and admitted that they were "drug users." The sergeant's testimony in that regard was merely cumulative.

As to the general admissibility of the testimony, we have no doubt. The gravamen of the offense of keeping and maintaining this particular common nuisance is that it "is resorted to by drug abusers for purposes of illegally administering controlled dangerous substances." The character of the people who "resort" to the place as "drug abusers" is vital to the establishment of the "common nuisance."

We find a strong analogy, in terms of admissible evidence, to the case of "disorderly houses," an allied variety of "common nuisance." The similar origin and similar characteristics of these various forms of common law "common nuisances" was traced by us in *Ward v. State*, 9 Md. App. 583, 267 A. 2d 255, and in *Skinner v. State, supra*. We hold that the reputation as "drug abusers" of those who resort to this particular variety of common nuisance for this particular purpose is just as relevant as is the reputation as "prostitutes" of those who frequent common law disorderly houses or bawdy houses. In treating that analogous problem, the Court of Appeals said in *Beard v. State*, 71 Md. 275, 276-277, 17 A. 1044:

> "The offense is that of a common nuisance, and it is necessary that the indictment should contain facts to show that a common nuisance has been created or permitted. This is done by allegation of such

facts as show that the traverser maintains, promotes, or continues, what is noisome and offensive, or annoying and vexatious, or plainly hurtful to the public, or is a public outrage against common decency or common morality, or which tends plainly and directly to the corruption of the morals, honesty, and good habits of the people; the same being without authority or justification of law.

. . . .

. . . These questions are, whether it was competent to the prosecution to prove by witnesses the general reputation or character of the women for lewdness, who frequented the house kept by the traverser; . . . We can perceive no possible objection to the admissibility of such evidence. . . . [T]he general reputation of those [who] frequented it was admissible for the purpose of characterizing the house and showing the object of their visits. . . . And as the object of the inquiry was to show the disreputable and degraded character of the women who found admission to the house of the traverser, it was unquestionably competent to show it either by proof of general reputation, or by proof of particular acts of lewdness, to the knowledge of witnesses; and it could make no difference where such acts occurred."

To like effect, see *Herzinger v. State,* 70 Md. 278, 280-281, 17 A. 81:

"The keeping of a bawdy-house constitutes at common law a common nuisance, 'not only in respect to its endangering the public peace, by drawing together dissolute and debauched persons, but also in respect of its apparent tendency to corrupt the manners of both sexes, by such an open profession of lewdness.' . . . And in the trial of such cases it is well settled that evidence of the bad character for chastity of the women who frequent

the house is admissible, as showing or tending to show the purpose for which the house is used."

See also *Henson v. State*, 62 Md. 231, and *Shaffer v. State*, 87 Md. 124, 39 A. 313.

### Disclosure of the Informant's Identity

The appellant also contends that the trial judge committed error in permitting the State to withhold the identity of the informant. The law is clear that where an informant simply furnishes probable cause and is not a participant in the criminal transaction, the State is not required to divulge his identity. The critical question, in determining when disclosure is required, is whether the informant was "an integral part of the illegal transaction" and, therefore, "necessary and relevant to a fair defense." *McCray v. Illinois, supra; Nutter v. State*, 8 Md. App. 635, 262 A. 2d 80; *Whittington v. State*, 8 Md. App. 676, 262 A. 2d 75; *Gill v. State*, 11 Md. App. 593, 275 A. 2d 505. We see no error.

### Removal Due to Pre-Trial Publicity

The appellant complains that Judge Robert E. Clapp, Jr., abused his discretion in denying the appellant's pretrial motion for a change of venue based upon a charge of prejudicial publicity. We have reviewed the half-dozen or so newspaper clippings from *The Frederick News* and from *The Frederick Post*, submitted as an exhibit to Judge Clapp, and we find them unremarkable quantitatively or qualitatively. No banner headlines, no photographs and no lurid reporting of any sort were involved. They were news stories pure and simple, reporting on criminal developments in the Court House, and were moderate and fair in tone. The total coverage was minimal.

The newspaper stories, moreover, appeared during the summer of 1972, and the trial did not take place until October, 1972. At the time of trial, the only two jurors who had read about the appellant's case were stricken from the jury panel for cause. There was simply no abuse of discretion here. *McLaughlin v. State*, 3 Md. App. 515, 240 A. 2d 298; *Bremer v. State*, 18 Md. App. 291, 307 A. 2d 503.

## Qualifying of Experts

The appellant contends that three State's witnesses were erroneously permitted to testify as experts, notwithstanding their lack of demonstrated expertise.

Curtis A. Bowen testified that he was a graduate of the University of Maryland School of Pharmacy, had worked for several years for the Federal Drug Administration and had for the past 15 years been a working pharmacist in Frederick. He was permitted to testify about the three drugs recovered by the police from the trash bags on May 4. He identified each of the three by name, and testified that each one was a controlled dangerous substance, contained on various schedules of such controlled dangerous substances. We see no abuse of discretion whatsoever in permitting Mr. Bowen to so testify. *Mills v. State*, 12 Md. App. 449, 458-459, 279 A. 2d 473.

The appellant objected to the testimony of Trooper Reburn. Trooper Reburn simply identified a syringe as a syringe, and testified that in his experience, syringes can be used by heroin addicts for the intravenous injection of heroin. Trooper Reburn had been a State trooper for eight years, had been assigned to narcotics investigations for four years, had attended schools conducted both by the State Police and by the Bureau of Narcotics and Dangerous Drugs, and had been involved in narcotics investigations, in the course of which he had seen as many as 1,000 syringes used for unlawful purposes. We find no abuse of discretion in permitting him to testify.

The critical testimony of Sgt. Harbaugh was his identification of both marihuana seeds and growing marihuana. Sgt. Harbaugh had received narcotics training with the New Jersey State Police and with the Federal Bureau of Narcotics and Dangerous Drugs. He had been involved in drug investigations for four years. He had delivered lectures on drugs to various civic organizations, schools and churches. He had conducted the majority of the drug investigations in Frederick County for the preceding four years. He held a B.S. Degree in sociology, which training included research into drug abuse. He established

his past experience with marihuana seeds, with marihuana residue and with marihuana plants. He established his ability to recognize it by sight and by smell. He described in minute detail the structure of a marihuana leaf, and the growth cycle generally of the marihuana plant. He testified that he had been qualified on previous occasions to testify in court on the identification of growing marihuana plants. We hold that there was no abuse of discretion in permitting him to testify.

### *Jury Instruction on Date of Offense*

The appellant finally objects to a part of the jury instruction given by Judge Barrick:

"As far as the date is concerned, the indictments are dated that the crime occurred on May 19, 1972. You are not restricted to that date alone. Any date in April, May — and I think that is the only two months we are dealing with here — if you find these crimes occurred in April or May, 1972, it would be sufficient for you to convict on those counts even though the indictment is dated May 19, 1972. In other words, it doesn't have to occur on that specific date, and I think the testimony in this case only involves two months, really; so if any of these crimes that are alleged in this indictment occurred in that two month period prior to May 19, if you find such evidence, you could convict even though it may not have occurred on that exact date."

The objection lodged by the appellant to the instruction was a general one. Since the common nuisance charge, by its very nature, requires proof of its recurring and continuing character, the instruction is unoffending. Even as to the possession charge, we find *Yanch v. State*, 201 Md. 296, 300, 93 A. 2d 749, dispositive. The contention is without merit.

*Judgments affirmed.*